Jesse MELANCON

v.

The Honorable John J. McKEITHEN, Individually and in his capacity as Governor of the State of Louisiana, et al.

Mrs. Edith HILL

v.

The Honorable John J. McKEITHEN, Individually and in his capacity as Governor of the State of Louisiana, et al.

Fleta A. JONES, as Natural Tutrix of the Minor, Brenda Ware

v.

AETNA CASUALTY AND SURETY COMPANY et al.

Derle LONG and Lorena Long

v.

The Honorable John J. McKEITHEN, Individually and in his capacity as Governor of the State of Louisiana, et al.

Guthrie A. MAYES and Charlie G. Garner

v.

Frederick S. ELLIS et al.

Joseph H. MOTICHEK

v.

The Honorable John J. McKEITHEN, Individually, and in his capacity as Governor of the State of Louisiana, et al.

Mrs. Pauline DAVIS, Next of Friend of Charles Davis and Jerry Davis

v.

The Honorable John J. McKEITHEN et al.

Angie R. LEWIS, Individually and Duly Qualified Natural Tutrix of the Minor, Velecia Ann Lewis

v.

FORD MOTOR COMPANY et al.

Civ. A. Nos. 3390, 67-20, 68-2, 68-28, 68-110, 68-225, 70-1857 and 71-227.

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

March 1, 1972.

Robert B. Neblett, Jr., Leonard Fuhrer, Neblett Fuhrer & Hunter, Alexandria, La., for plaintiff Fleta A. Jones.

Jack P. F. Gremillion, Atty. Gen., Wesley R. Wirtz, Baton Rouge, La., for defendants, Chief Justice and Associate Justices, Governor, and Attorney General.

Sam A. LeBlanc III, Adams & Reese, New Orleans, La., for defendant, Aetna Casualty and Surety Co.

Arthur Cobb, Baton Rouge, La., for plaintiffs Hill, Melancon, Motichek and Derle Long.

Calvin E. Hardin, Jr., Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for defendant, Insurance Co. of North America.

Jack P. F. Gremillion, Atty. Gen., of Louisiana, Thomas W. McFerrin, Asst. Atty. Gen., Kenneth C. DeJean, Sp. Counsel to the Atty. Gen., Baton Rouge, La., for defendant, Governor McKeithen, Attorney General Gremillion, Judges Paul B. Landry, Frederick S. Ellis and Julian E. Bailes.

Carlos G. Spaht, Kantrow, Spaht, Weaver & Walter, Baton Rouge, La., for defendants, Continental Casualty Co., Willie & Willie Contractors, Inc., Willie & Willie Realtors, Leo Willie and Marlin D. Willie.

Sydney B. Nelson, Pugh & Nelson, Shreveport, La., for Hollis Berry, Jr., amicus curiae.

Carlos G. Spaht, Kantrow, Spaht, Weaver & Walter, Baton Rouge, La., for defendant, Jess Johnson.

Leon Sarpy, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendants, amicus curiae.

J. D. DeBlieux, DeBlieux & Guidry, Baton Rouge, La., for defendant, Clovis Hendry, Inc. and Benny Spence.

J. Minos Simon, Lafayette, La., for plaintiff Mayes.

Jack P. F. Gremillion, Atty. Gen., Wesley R. Wirtz, Asst. Atty. Gen., Kenneth C. DeJean, Special Counsel, Baton Rouge, La., for defendants, Ellis, McKeithen and others.

L. O. Lauve, Alexandria, La., for plaintiff, Angie R. Lewis, etc.

Valentine Irion, Shreveport, La., for defendant, Ford Motor Co.

Roy L. Beard, Shreveport, La., for defendant, Wray Lincoln Mercury, Inc.

G. M. Bodenheimer, Jr., Shreveport, La., Donn Moss, Baton Rouge, La., for defendant, Many Motors Co., Inc.

Before WISDOM, Circuit Judge, and WEST and HEEBE, District Judges.

WISDOM, Circuit Judge:

The plaintiffs in these consolidated cases (See Appendix A) invite this Court to hold that the Seventh Amendment of the United States Constitution [1] applies to civil actions in Louisiana courts through the Due Process Clause of the Fourteenth Amendment. We decline the invitation. The Supreme Court has never adopted the principle that the Due Process Clause of the Fourteenth Amendment totally "incorporates" all the specific guarantees in the Bill of Rights. Assuming that the term "selective incorporation" properly describes the process by which now a specific guarantee in the Bill of Rights is considered applicable to the states, we note that the Supreme Court has never selected the Seventh Amendment as applicable to trials in state courts. Taking a pragmatic and federally sound approach to the issue, we hold that jury trial in civil cases and the absolute prohibition of judicial reexamination of jury findings in civil cases are not so fundamental to the American system of justice as to be required of state courts by due process.

Although the Louisiana Constitution contains no guarantee of the right to a trial by jury in civil cases, Articles 1731–33 of the Louisiana Code of Civil Procedure require a jury trial on the timely demand of either party to an action.[2] Civil appeals in Louisiana, however, are on both the law and the facts. La.Const., 1921, Art. VII, § 10 and 29.[3] Many Louisiana lawyers consider that appellate scrutiny of the facts offsets the advantages of sympathy or pooled intuition associated with jury trials. As a consequence, civil jury trials are a rarity in Louisiana.[4] A related rarity is a long

---

1. The Seventh Amendment reads as follows:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

2. Art. 1731. Issues triable by jury
Except as limited by Article 1733, the right of trial by jury is recognized.

  .  .  .

Art. 1732. Demand for jury trial
A party may demand a trial by jury of any issue triable of right by a jury in a pleading filed not later than ten days after the service of the last pleading directed to such issue.
Art. 1733. Limitation upon jury trials
A trial by jury shall not be available in:
(1) A suit demanding less than one thousand dollars exclusive of interest and costs;
(2) A suit on an unconditional obligation to pay a specific sum of money, unless the defense thereto is forgery, fraud, error, want or failure of consideration;
(3) A summary, executory, probate, partition, mandamus, habeas corpus, quo warranto, injunction, concursus, workmen's compensation, emancipation, tutorship, interdiction, curatorship, legitimacy, filiation, separation from bed and board, annulment of marriage, or divorce proceeding;
(4) A proceeding to review an action by an administrative or municipal body; and
(5) All cases where a jury trial is specifically denied by law.

3. "In all civil and probate cases where the Supreme Court is given appellate jurisdiction, the appeal shall be both upon the law and the facts." Art. VII, § 10.
"[In the Court of Appeal] all appeals shall be both upon the law and the facts." Art. VII, § 29.

4. For the 1971 court year there were 178 civil jury trials in Louisiana. There were 103,579 civil suits filed with 86,672 terminated in the 1971 court year. In the

queue of litigants, often found in other states, waiting for many months or years for their actions to be tried.[5] A civil jury trial in Louisiana, however, is more than an exercise in futility, for appellate courts will not disturb a jury's or a trial judge's verdict unless the findings of fact are "manifestly erroneous".[6]

## I. PROPRIETY OF A THREE-JUDGE COURT AND JURISDICTION OF THE COURT

A. At the outset we must meet the defendants' contentions that this case is not one for a three-judge court. *See* 28 U.S.C. § 2281.[7]

1. Relevant to the three-judge court issue is the fact that a decision favorable to the plaintiffs would disrupt the Louisiana judicial system for the trial and appeal of civil actions.

The First Session of the Legislative Council of the Territory of Orleans adopted the Practice Act of 1805, which evolved into the Code of Practice of 1825.[8] This Act introduced juries in Louisiana. Chap. 26 pp. 210, 216, Act of

1969 court year 21 of the 34 district courts reported no civil jury trials. 1971 Report of the Judicial Council of the Supreme Court of Louisiana, 54, 63.

5. "[T]he fact remains that the procedural system in Louisiana state courts actually dispenses justice without undue delay. . . . In Louisiana there is scarcely a parish among the sixty-four wherein a case cannot be heard within three to six months of the time a trial is requested." Sarpy, Civil Juries, Their Decline and Eventual Fall, 11 Loyola L.Rev. 243, 255 (1963).

6. Judge Albert Tate (now a Justice of the Louisiana Supreme Court) has written: "[Louisiana] appellate courts must adhere to the settled jurisprudential rule . . . that a trial court's factual determinations should be accepted on appellate review, in the absence of manifest error." Tate, Manifest Error —Further Observations on Appellate Review of Facts in Louisiana civil cases, 22 La.L.Rev. 605, 614 (1962). See also the text of the final paragraphs in Section IV of this opinion. The Louisiana rule applies to trials by a judge and jury as well as to trials by the judge alone.

7. An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

28 U.S.C. § 2281.

8. In 1762 by secret treaty France ceded to Spain the Province of Louisiana lying west of the Mississippi and the portion on the east bank surrounding the City of New Orleans. By the ordinance of Nov. 25, 1769, Governor O'Reilly substituted Spanish law (Nueva Recopilación de Castilla and the Recopilación de las Indias) for French law. Before the Spanish regime, Louisiana procedure followed the Custom of Paris and the Ordonnance Civile of Louis XIV of April 1677. The influence of these laws and of French jurists persisted during the Spanish domination despite the O'Reilly ordinance. After France ceded Louisiana to the United States, Governor W. C. C. Claiborne, under the temporary authority of an Act of Congress of Oct. 31, 1803, 2 Stat. 745, established a Court of Common Pleas with himself as the court of last resort. The imposition of common law courts on the already confused merger of French and Spanish law added chaos to confusion. Congress came to the rescue by adopting a statute dividing Louisiana into two territories and providing for the exercise of judicial power by courts in the Territory of Orleans to be created by the Legislative Council. Act of March 25, 1804, 2 Stat. 283. The First Session of the Legislative Council of the Territory of Orleans adopted the Practice Act of 1805, drafted by Edward Livingston, L. Moreau Lislet, and Pierre Derbigny, who were also the Framers of the Civil Code of 1825. Livingston, skilled in the common law and the civil law, is attributed with having adapted to French and Spanish law, *but in simplified form*, many aspects of the common law. An outstanding authority on Louisiana legal history has noted: "Of all Louisiana legal institutions, the Code of Practice is probably the most individual, wrought as it is from these dif-

April 10, 1805. In this statute, as in all the State's later Codes of Practice, the right to a civil jury is absolute on the timely request of either party to the action. See footnote 2.

When Louisiana became a state in 1812, by constitution, statute, and judicial decision Louisiana accepted the common law criminal system, including the right to trial by jury in prosecutions.[9] Then and now in Louisiana the law of crimes is substantially the same as it is in other states and procedures in criminal cases, including jury procedures, show little more variance from the norm than may be found in many states. This receptivity to Anglo-American law in the criminal field is not true of private law and civil procedure. Louisiana jurists, influenced by their French and Spanish legal heritage, never accepted the civil jury's findings as sacrosanct.[10] Four years after Louisiana became a state, the Louisiana Supreme Court held that appellate courts could review the evidence and modify or reverse a civil jury's verdict. Abat v. Doliolle, 1816, 4 Mar.(O.S.) 136. This is still the law, subject to the "manifest error" doctrine. The current Louisiana constitution, following earlier constitutions, expressly provides for appellate review of "the law and the facts". Const. of 1921, Art. 7, §§ 10, 29. In Louisiana, as in civilian jurisdictions generally "equity" is fused with what is considered the "common law" in Anglo-American jurisdictions;[11] prohibition of appellate review of the facts would tend to destroy this fusion. The state has never had common law courts as distinguished from other courts. It has never had common law forms of action, still ruling some state courts from the grave. Indeed, the reference in the Seventh Amendment to "suits at common law", construed as the Framers construed it, is meaningless in the Louisiana judicial system. It could

---

ferent systems. The simplicity of our practice has always been a source of pride." Tucker, Source Books of Louisiana Law, 7 Tulane L.Rev. 82 (1932). The Louisiana Supreme Court has said: "But one of the most valuable features of our system of [Louisiana] jurisprudence is the simplicity with which parties are permitted to bring their rights before the tribunals of justice. The technicalities which in other countries embarrass and obstruct the progress of justice are unknown to it. All it requires is that each party shall so state his grounds of attack or defense that the adversary shall not be taken unawares, and that the judgment which may be rendered, for or against whom it may be given, to protect himself by a plea of *res judicata*. These are the only objects to be obtained by pleading." Stroud v. Beardslee, 2 Mart.(N.S.) 84 (1824) (Opinion by Matthews, J. who was trained in the common law and who also served as a territorial judge.) Louisiana had simplified pleadings and procedures long before the Field Codes or the Federal Rules.

9. Const. of 1812, Art. VI, § 18. See Long's Constitutions of Louisiana, pp. 12–14. "While the jury trial functions in substantially the same manner in criminal cases in this state as in other American jurisdictions, it plays a lesser and quite different role in the civil procedure of Louisiana." Official Comment, Preliminary Statement on Chap. 7, Jury Trial, La.Code of Civil Proc. (1961).

10. See Sarpy, Civil Juries, Their Decline and Eventual Fall, 11 Loyola L.Rev. 243 (1962–63); Hubert, Trial by Jury under the New Code of Civil Procedure, 35 Tulane L.Rev. 519 (1961); Note, 41 Tul.L.Rev. 922 (1967).

11. Article 21 of the present Louisiana Civil Code of 1870, which goes back to Projet du Gouvernement of 1800 and an early draft of the Code Napoleon, reads: "In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent." The development of equity in Chancery Courts did not include trial by jury and necessarily involved appellate review of the facts. See James, Right to a Jury Trial in Civil Actions, 72 Yale L.Jour. 655, 657 (1963); James, Civil Procedure, Chap. 8 (1965). To prohibit appellate scrutiny of the facts would have a serious effect on Louisiana's fusion of law and equity. Cf. the argument of Edward Livingston and Daniel Webster in Parsons v. Bedford, 28 U.S.(3 Peters) 433, 435, 7 L.Ed. 732 (1830).

be said that, in terms, the Seventh Amendment is inapplicable to Louisiana.

■ These consolidated cases seek to overthrow Louisiana's simple, long-standing, demonstrably effective civil procedures. They therefore clearly come within the policy underlying Section 2281: that is, that a three-judge district court is required when plaintiffs seek in federal courts to restrain enforcement by state officials of state statutory or constitutional provisions.

■ 2. The defendants argue that since the Supreme Court has applied the Bill of Rights selectively to the States and has consistently ruled the Seventh Amendment inapplicable to the States, no substantial federal question exists requiring the case to be heard by a three-judge court. *See* Bailey v. Patterson, 1962, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512; Ex parte Poresky, 1933, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 1323. It is true that a long and consistent line of Supreme Court cases stands adverse to the plaintiffs' contention.[12] Numerous recent Supreme Court cases, however, have shown an increasing willingness on the part of the Court to re-examine the old precedents which held certain specifics in the Bill of Rights inapplicable to the States.[13] These cases illustrate the responsiveness of the Court to an evolving standard of due process. Accordingly, the Supreme Court never having commanded total incorporation of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment, we conclude that at this point in our constitutional history a substantial federal question exists here: we must reassess the requirements of due process with respect to jury trials and the review of jury findings in state civil proceedings.

■ B. The plaintiffs' complaints predicate "jurisdiction" on 28 U.S.C. §§ 1331 and 1343(3) and 42 U.S.C. §§ 1983, 1981, and 1988. We hold that this Court properly has jurisdiction under 28 U.S.C. § 1343(3)[14] of a cause of action based on 42 U.S.C. § 1983[15] alleging deprivation, under color of state law, of rights secured by the United States Constitution.

12. *See* Edwards v. Elliot, 1874, 21 Wall. 532, 88 U.S. 532, 22 L.Ed. 487; Walker v. Sauvinet, 1876, 92 U.S. 90, 23 L.Ed. 678; Chicago, R. I. & P. R. R. Co. v. Cole, 1919, 251 U.S. 54, 40 S.Ct. 68, 64 L.Ed. 133; Hardware Dealers Mutual Fire Ins. Co. v. Glidden Co., 1931, 284 U.S. 151, 52 S.Ct. 69, 76 L.Ed. 214; *see also* Anno. 18 L.Ed.2d 1388, 1410–1412.

13. *Compare* Malloy v. Hogan, 1964, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 with Adamson v. California, 1947, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903; Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 with Betts v. Brady, 1942, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595; Robinson v. California, 1962, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 with Collins v. Johnston, 1915, 237 U.S. 502, 35 S.Ct. 649, 59 L.Ed. 1071; Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 with Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138; *see also* Anno. 18 L.Ed.2d 1388; Anno. 23 L.Ed.2d 985.

14. The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: . . . (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

28 U.S.C. § 1343(3).

15. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. *See* Douglas v. City of Jeanette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Hague v. CIO, 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

■■ The defendants object to the jurisdiction of this Court on several grounds. First, some of the defendants as in Melancon v. McKeithen (see Appendix A), argue that the trial judge's order granting a new trial is not a final judgment and, therefore, may not be appealed. This is not however an appeal from the state order but rather an original action in federal court where the final judgment rules of 28 U.S.C. §§ 1257 and 1291 have no application. Second, some of the defendants argue, citing Rooker v. Fidelity Trust Co., 1923, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362, that a lower federal court may not review on appeal a decision of a state court. Again we emphasize that our jurisdiction in this case is not appellate but original.[16] Third, some of the defendants complain of the failure of these plaintiffs to exhaust the appellate path supposedly open to them in state court, although they must know it to have been closed for 165 years. Moreover, as we read the cases, state remedies need not be exhausted before commencing a suit under Section 1983. *See* McNeese v. Board of Education, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622; Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; Moreno v. Henckel, 5 Cir. 1970, 431 F.2d 1299. Fourth, some of the defendants contend, independent of their assertion as to the impropriety of a three-judge court, that jurisdiction is improper because their case does not involve a substantial federal question. *See* Pan American Petroleum Corp. v. Superior Court, 1961, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584. We do not, however, predicate jurisdiction on 28 U.S.C. § 1331 but rather on 28 U.S.C. § 1343(3). Finally, defendants argue that this Court lacks "jurisdiction" because the defendant judges are immune from suit. All of the cases upholding judicial immunity have involved damage actions. *See,* e. g., Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288. Judges are not immune to injunctive suits such as this. In fact, it is just such a suit which Younger v. Harris, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 and its companion cases would seem to permit.[17]

16. In Brown v. Chastain, 5 Cir. 1969, 416 F.2d 1012, over the vigorous dissent of Judge Rives, the Court held that a federal district court has no jurisdiction to review a final determination of a federal constitutional question voluntarily submitted to and decided by a state court in state court litigation. At least two members of the Supreme Court have indicated doubts about the soundness of that holding. *See* Florida State Bd. of Dentistry v. Mack, 1971, 401 U.S. 960, 91 S.Ct. 971, 28 L.Ed.2d 245 (White, J., with whom Burger, C. J., joined, dissenting from denial of certiorari).

The doctrine of Brown v. Chastain is not applicable here. First, the suit filed in federal court in Brown v. Chastain sought to attack the *substantive* decision rendered by a state court on a constitutional question; that is, the complaint in the federal attack on the merits of the case in the state court. In the instant cases, the plaintiffs resort to federal court in an attempt to challenge the *procedure* used by the state court, i. e. appellate review of facts. The judgments on the merits of the state tort actions are not attacked. Second, Brown v. Chastain involved a state court constitutional challenge decided in a true adversary context. The plaintiffs presented a constitutional challenge in the state court with the defendants representing the adverse view of the question. Third, although in Brown v. Chastain some reason exists for holding the plaintiffs to their initial choice of forum for the litigation of constitutional claims, the plaintiffs here had no real choice of forum. They could bring their tort actions only in state court, and, once they did, they were trapped in state court as their forum to challenge the state procedure. Finally, consistent with the principle of cooperative federalism, on which Brown v. Chastain is based, our approval of the Louisiana procedure fosters federalism by allowing latitude to the states in fashioning their systems of civil procedure.

17. In view of our disposition of these cases, we need not and do not reach numerous problems raised by Younger v. Harris and its companion cases. They are formidable. In particular, were we to grant plaintiffs' request for injunctive relief, we should have to decide, among other things, (1) whether the

## II. HISTORICAL BACKGROUND AND DECLINE OF THE CIVIL JURY

If the history of the jury in Anglo-American law proves anything, it proves that the civil jury has assumed many forms and has been circumscribed, circumvented, and abandoned in various types of cases in many jurisdictions.

"One persistent error, adopted for many centuries, and even now hard to dispel, is that the Great Charter guaranteed trial by jury.[18] This belief is now held by all competent authorities to be unfounded." McKechnie, Magna Carta (1914), 134. The theory now generally accepted is that the jury developed from Norman inquests which in turn developed from the Frankish *inquisitio*, the prerogative rights of the Frankish kings.[19] Originally jurors were neighbors called in because they knew or might know the relevant facts of the case put before them. In short, the jury system has turned upside down. By the time of Henry II the Grand Assize was used to settle title claims and the Petty Assize to settle disputed posses-sion; by the consent of both parties other disputes could be referred to the verdict of local recognitors (*jurata* and *assisa*). "These tentative measures, however, still vague and unconsolidated, must not be identified with the definite procedure into which at a later date they coalesced: Magna Carta did not promise 'trial by jury' to anyone."[20] McKechnie, 138.

This is not the place for an extended historical essay on the development of non-jury trials, but a few words on that subject may be appropriate. Without juries the Court of Chancery coexisted with the Courts of King's Bench, Common Pleas, and Exchequer, and by 1787–1791 "determinations in equity were thought to have as much force as determinations at law, and that the possible impact on jury trial rights was not viewed with concern".[21] Lord Ellesmere, not Sir Edward Coke, had the last word on whether Chancery was entitled to the rights of a "court of record".[22] Lord Ellesmere triumphed from the grave when The Judicature Acts of 1873–5 fused law and equity in civil suits; there-

---

rationale of Younger applies to pending civil proceedings, (2) whether the federal anti-injunction statute, 28 U.S.C. § 2283, applies to this case, and (3) whether § 1983 is an "expressly authorized" exception to § 2283.

18. The source of this error was identification of jury trial with the *judicium parium* of chapter 39 of Magna Carta. "Judgment by peers" simply acknowledged the right of a baron to lay his case before other barons when a dispute arose among them or with the crown itself. See particularly Keeney, Judgment by Peers (1952).

19. 1 Pollock and Maitland, 140 (2d Ed. 1959); Plucknett, A Concise History of the Common Law, 106–111, 120 (5th Ed. 1956); 1 Holdsworth, A History of English Law, 312, 328. German authorities, partly relied upon by these acknowledged English authorities, have considered this subject in depth.

20. McKechnie points out however: "While the *assisa* was narrowly confined to a few types of cases, the *jurata* was a flexible remedy capable of indefinite expansion, and thus soon became the more popular and the more important of the two. Sometimes the twelve recognitors, summoned as an *assisa* by the King's command, were by consent of both litigants turned into a *jurata* to try a broader issue that had unexpectedly arisen. This explains the phrase, *assisa veritutur ad juratam*. The *assisa* and *jurata*, always closely connected and resembling each other in essential features, can both claim to be ancestors of the modern civil "jury,"—the name of the more popular institution having survived. Magna Carta, in providing for the frequent holding of the three petty assizes, marked a state in the development of the Civil Jury; while, by enforcing the criminal procedure of Henry Plantagenet, and guarding it from abuse, the Charter had also a vital bearing on the genesis of the Grand Jury and the Petty Jury alike." McKechnie, 137.

21. Shapiro and Coquillette, The Fetish of Jury Trial in Civil Cases—A Comment on Rachal v. Hill, 85 Harv.L.Rev. 442, 455 (1971).

22. Judgment of James I in 1616, 21 Eng. Rep. 65.

after the usual mode of trial came to be by a judge alone. What is true of suits in equity in England is *a fortiori* true of suits in admiralty:[23] for many hundreds of years and today no one has considered a jury essential to the concept of a fair trial in admiralty suits.[24]

When we turn to the Federal Convention, we find that trial by jury in civil cases was touched upon in debate but was intentionally left out of the final document, probably because of the great diversity in state civil practice.[25] In the Federalist, No. 83, Alexander Hamilton readily conceded the importance of trial by jury in criminal cases and in some civil cases but, he said: "I must acknowledge that I cannot readily discern the inseparable connection between the existence of liberty, and the trial by jury in civil cases. . . . The excellence of the trial by jury in civil cases appears to depend on circumstances foreign to the preservation of liberty."[26] In a recent study of all the available material, English and American, on the background of the Seventh Amendment, the author concluded that the Seventh Amendment was not intended to codify a rigid form of jury practice—that indeed in 1791 there was no consistent practice in the colonies and the thirteen original states to be codified.[27]

23. In Tudor times the Admiralty Court was a general commercial court, dealing with classes of commercial disputes, whether maritime or not. Elton, The Tudor Constitution (1960), 152.

24. Chief Justice Burger has said: "Fundamentally there is no difference between ship collisions and automobile collisions except that ships generally involve larger stakes. Yet these wise authors [of the Constitution] left admiralty litigation in the hands of judges without juries. . . . The Claims Act of 1947 in which the Congress after much study provided for trial by a Federal Judge without a jury. . . . I submit that if [the Framers] had been able to anticipate the automobile and its impact on courts they would have done one and possibly two things: (a) they would have made personal injury cases an exception to federal diversity jurisdiction or (b) they would have said that if a ship collision is to be tried by a judge without a jury a simple automobile case could be disposed of in the same way." (emphasis added). Address by Chief Justice Burger, Testimonial Dinner for Pennsylvania Supreme Court Chief Justice Bell, Philadelphia, Nov. 14, 1970, quoted in Monograph, Defense Research Institute, Inc. No. 13 (1971).

The British Administration of Justice Act, 1956, gives jurisdiction over aircraft to Admiralty.

25. See Henderson, The Background of the Seventh Amendment, 80 Harv.L.Rev. 289, 292–4. See also The Federalist No. 83, at 524 (Wright, 1st ed. 1961) (Hamilton).

26. The Federalist No. 83 (Wright Ed.) p. 522, 523.

27. Nowhere in the history of the Philadelphia convention, the ratifying conventions of the several states, or the specific "legislative history" of the Bill of Rights can any evidence be found that the relation of judge to jury was considered as affected in any but the most general possible way by the seventh amendment, or even that it was considered at all. Nor can any implicit understanding as to this relationship be presumed, for among the thirteen original states there were at least half a dozen widely differing patterns of civil practice, as an examination of the available case law will show. On the contrary, it was well understood that no single system of civil practice could satisfy everybody. The varied procedures of the federal courts in the early years provide further evidence that no particular pattern was understood to be prescribed. . . . [T]he positions taken by Justices Black and Douglas appear to be based on a misunderstanding (which was widespread in the eighteenth century) of the powers of the jury in criminal cases, and particularly of its peculiar position in criminal libel cases before Fox's Libel Act. The jury's unlimited right to acquit in a criminal case had been well recognized at least since the latter half of the seventeenth century except, because of a peculiar quirk in the law, in these same criminal libel cases. These cases led to widespread discussion of the jury's right "to decide the law," and by emotional osmosis it was argued that the jury had this right in civil cases as well. But it is hard to follow the logic of an argument which would infer from a jury's now unquestioned right to acquit in criminal cases—a right which is a one-sided protection for the defendant, like so much else in criminal pro-

In England the civil jury has virtually vanished. The Judicature Acts of 1873–5, fusing law and equity, "may be regarded as the triumph of Chancery ideas in civil suits".[28] Within a few years of the passage of these acts the use of juries "declined drastically; from 1885 until 1917 roughly half of the cases heard in the King's Bench Division were before a judge alone".[29] Under the Administration of Justice Act of 1933, 23–24 Geo. 5, c. 36, jury trial is to be ordered only where there is a charge of fraud (at the request of the party charged) or the case is one of libel, slander, malicious prosecution, false imprisonment, seduction, or breach of promise. Even then there is no jury trial if the court is of the opinion that the trial requires any prolonged examination of doctrines or accounts or any scientific or local investigation which cannot be conveniently made with a jury. In 1958, of 702 cases tried in the Queen's Bench only 24 were before a jury.[30] "Juries have never been popular in County Courts, and changes in the right to jury trial were made on the same lines as for the King's Bench, the rules governing County Courts being enacted in the County Courts Act of 1934. The result was a virtual end to jury trial in County Courts; in 1936 of 28,221 cases determined on hearing there was jury trial in seven cases, and an average of under one a year over the last ten years." Jackson, The Machinery of Justice in England, Civil Jurisdiction, p. 65 (1963).

Lord Devlin, then Sir Patrick Devlin, explained:

"The popularity of trial by judge alone is now decisively established; the proportion of jury trials is now 2 percent or 3 percent of the whole. About half of this is composed of the excepted cases (which form only a minute fraction of civil litigation) and the other half consists of cases in which a successful application has been made by one side or the other—usually a plaintiff and often with a case that is weak in law.

It must not be supposed that this severe decline is due to a jury being refused when asked for; the number of refusals is in fact quite negligible. An attempt after 1933 to suggest that trial by jury ought not to be granted unless there was a special reason for it was decisively negatived by the full Court of Appeal, which held that the discretion to grant it was quite unfettered. The decline is due to the fact that juries are not being asked for. . . ."[31]

"Civil jury trial in Scotland has never been 'the palladium of the Constitution,'

---

cedure—an equally unlimited right to give a verdict for either side in an ordinary civil case "between party and party" in which only money is at stake, regardless of the verdict's rationality or support in the evidence. The immense importance of the eighteenth-century criminal libel cases and of Fox's Libel Act in the history of free government is unquestioned; but their relevance to damage suits for negligence, breach of contract, or illegal restraint of trade is nil. . . . In the civil courts of the American colonies and the early United States, as we have seen, there were nearly as many patterns of practice as there were jurisdictions. In some states there was much less judicial control of the jury than in England, and in some states rather more. Neither during the ratification controversy nor in the subsequent proceedings on adoption of the Bill of Rights was any specific consensus expressed on the relation of judge to jury in civil cases. On the contrary, while there was agreement that civil juries in a general way were a good thing, the great diversity of practice in the thirteen states was referred to as a reason why no uniform constitutional rule was possible. This diversity, moreover, seems unquestionably to have been a principal reason why the seventh amendment was drafted in such general terms. Henderson, The Background of the Seventh Amendment, 80 Harv.L.Rev. 289, 290, 335 (1966).

28. Jackson, The Machinery of Justice in England, p. 64 (1960).

29. *Id.*

30. *Id.* at 65.

31. Devlin, Trial By Jury, 130–133 (1956).

as is the case in English law, since the origins of Scots law are very different. Not only is this institution no part of the Scottish legal ethos, but it conflicts sharply with the civilian tradition of Scottish law".[32] The British belatedly introduced the civil jury in Scotland—at the beginning of the nineteenth century —but it "has been whittled down by legislation and practice so that in modern times it is mainly employed in actions for damages for personal injury".[33] In South Africa, where the Roman-Dutch law has many similarities to Scots law and to Louisiana law, "no tears were shed in South Africa when trial by jury in civil cases was abolished" in 1927.[34]

It is presumptuous and chauvinistic to argue that civil trials in such countries as France and Germany and the Scandinavian countries are unfair. It is paradoxical and anachronistic to assert that the civil jury of 1791 is necessary to assure fair trials in suits at common law in this country when civil juries have been all but done away with in England, the source of the common law.

## III. INCORPORATION DOCTRINE

A. In Barron v. Baltimore, 1833, 7 Pet. 242, 8 L.Ed. 672, the Supreme Court established the principle that the first ten amendments to the United States Constitution were limitations on the power of the federal government: the Bill of Rights as such, does not apply to the States.[35] In 1868 the Fourteenth Amendment became part of the United States Constitution. Since then there has been active debate as to whether the specifics in the Bill of Rights apply to the States through the Due Process Clause of the Fourteenth Amendment.

B. Two years after the Fourteenth Amendment was adopted, in Justices v. Murray, 1870, 9 Wall. 274, 19 L.E. 658, the Court held that the Seventh Amendment prohibiting re-examination of facts was applicable to federal appellate courts when reviewing state court decisions, but recognized that the provision has no effect on the powers of state appellate courts. Four years later in Edwards v. Elliott, 1874, 21 Wall. 532, 88 U.S. 532, 22 L.Ed. 487, the Court, in dicta, stated that the Seventh Amendment right to jury trial "does not apply to trials in the State Courts." The question of the applicability of the Seventh Amendment provisions to the states through the Due Process Clause of the Fourteenth Amendment was squarely raised in Walker v. Sauvinet, 1876, 92 U.S. 90, 23 L.Ed. 678. The petitioner complained of a Louisiana statute requiring a judge to direct a verdict when the jury failed to agree. He contended that the statute violated his rights under the Seventh and Fourteenth Amendments. The Court responded with language which has been the governing law ever since:

[A]rt. 7 of the Amendments . . . relates only to trials in the courts of the United States. Edwards v. Elliott, 21 Wall., 557 [88 U.S. XXII., 402, 22 L.Ed. 487]. The States, so far as this Amendment is concerned, are left to regulate trials in their own courts in their own way. A trial by jury in suits at common law pending in the State Courts is not, therefore, a privilege or immunity of national citizenship, which the States are forbidden by the Fourteenth Amendment to abridge. A State cannot deprive a person of his property without due process of law;

32. Smith, Civil Jury Trial in Scotland, 50 Va.L.Rev. 1076, 1084 (1964).

33. *Id.* at 1086.

34. Centlivres, The South African Constitution and the Rule of Law, 1956 Butterworth's South African L.Rev. 3, 15.

35. In Louisiana, even before Barron v. Baltimore, it was *jurisprudence constante* that the Bill of Rights did not apply to state procedures. Territory v. Hat-

tick, 2 Mart. (O.S.) 87 (1811); Renthorp v. Bourg, 4 Mart. (O.S.) 97 (1816); Maurin v. Martinez, 5 Mart. (O.S.) 432 (1818). *Cf.* Huntington v. Bishop, 5 Vt. 186 (1832) in which the Supreme Court of Vermont held that the Seventh Amendment did not apply to state trials. "The restriction upon the re-examination of any fact tried by jury is limited, in terms to the Courts of the United States.

but this does not necessarily imply that all trials in the state courts affecting the property of persons must be by jury. This requirement of the Constitution is met, if the trial is had according to the settled course of judicial proceedings. Murray v. Hoboken L. & I. Co., 18 How., 280 [59 U.S. XV, 376, 15 L.Ed. 372]. . . .

92 U.S. at 92–93. For a hundred years the Supreme Court has not deviated from Walker v. Sauvinet. Indeed, the Supreme Court has frequently denied certiorari in cases involving the precise issues raised in the cases before us.[36]

C. The Supreme Court has never decided that the Fourteenth Amendment totally "incorporated" the Bill of Rights. Going back to the Slaughter-House Cases, 1872, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394, the Court held that the Due Process Clause did not protect New Orleans butchers against state laws which interfered with their right to do business. In Hurtado v. California, 1884, 110 U.S. 516, 48 S.Ct. 111, 292, 28 L.Ed. 232, the Court rejected the contention that due process included the right to indictment in a state court, although the court recognized that due process protected certain fundamental rights. In Chicago, Burlington & Quincy Railroad v. Chicago, 1897, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979, the first Mr. Justice Harlan, who had dissented in Hurtado without mentioning Hurtado, Barron v. Baltimore, or the Bill of Rights, held that due process required a state to pay just compensation for the taking of property for public use. This case is cited in Twining v. New Jersey, 1908, 211

U.S. 78, 99, 29 S.Ct. 14, 19, 20, 53 L. Ed. 97, for the proposition that "some of the personal rights safeguarded by the first eight Amendments against national action may also be safeguarded against state action, because a denial of them would be a denial of due process of law". Twining held that the Fifth Amendment privilege against self-incrimination is not a privilege or immunity of national citizenship guaranteed by the Fourteenth Amendment against abridgment by the States. The Court rejected the contention that the Fourteenth Amendment incorporated any of the specifics of the Bill of Rights. Certain rights are protected against state action "not because those rights are enumerated in the first eight Amendments, but because they are of such a nature as that they are included in the conception of due process of law". 211 U.S. at 99, 29 S.Ct. at 20. Mr. Justice Black later criticized this position as a "natural law gloss" on the Constitution.[37] On the other hand, Mr. Justice Frankfurter has said: "Decisions of [the Supreme Court] do not have equal intrinsic authority . . . The Twining case shows the judicial process at its best. . . . [It] should not be diluted, even unwittingly, either in its judicial philosophy or in its particulars."[38]

Palko v. Connecticut, 1937, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288, has been credited with modifying the Twining doctrine by applying a "selective" process of "absorption": The Fourteenth Amendment absorbed only those fundamental rights guaranteed in the Bill of Rights, such as freedom of thought and speech, without which neither liberty nor justice would exist if they were

36. See, e. g., Parsons v. Gulf, 1967, 389 U.S. 896, 88 S.Ct. 215, 19 L.Ed.2d 213; Jones v. Aetna, 1967, 389 U.S. 990, 88 S.Ct. 471, 19 L.Ed.2d 482; Mayes v. McKeithen, 1969, 396 U.S. 868, 90 S.Ct. 108, 24 L.Ed.2d 121; Marshall v. Southern Farm Bureau Casualty Co., 1968, 393 U.S. 883, 89 S.Ct. 189, 21 L.Ed.2d 158; King v. Vico, 1966, 385 U.S. 841, 87 S.Ct. 90, 17 L.Ed.2d 73; Broussard v. State Farm, 1967, 386 U.S. 909, 87 S.Ct. 885, 17 L.Ed.2d 783; Sule v. Mo. Pac. R.R. Co., 1966, 385 U.S. 819, 87 S.Ct.

46, 17 L.Ed.2d 58; Berry v. Aetna, 1971, 401 U.S. 1005, 91 S.Ct. 1255, 28 L.Ed. 2d 541 (Appeal dismissed for want of jurisdiction, and certiorari denied).

37. Adamson v. California, 1946, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903. Mr. Justice Black restated his position in a concurring opinion in Duncan v. Louisiana, 1968, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491.

38. Adamson v. California, 332 U.S. at 59, 67 S.Ct. at 1679.

sacrificed.[39] It is pertinent here that Mr. Justice Cardozo, speaking for the Court, declared: "The right to *trial by jury* and the immunity from prosecution except as the result of an indictment . . . are not of the very essence of a scheme of ordered liberty. . . . Few would be so narrow or provincial as to maintain that a fair and enlightened system of justice would be impossible without them. . . ." (Emphasis supplied.) 302 U.S. at 325, 58 S.Ct. at 152. *Palko,* it should be noted, dealt with "ordered liberty" in the context of criminal procedures. It should also be noted that the decision rejected the doctrine propounded by Mr. Justice Black, that the specifics of the Bill of Rights must be absorbed whole.

Mr. Justice Black, notably in his dissent in Adamson v. California, 1947, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, concluded from his studies of the legislative history of the Fourteenth Amendment that the amendment was designed to make the specifics of the Bill of Rights totally applicable to the states. Other justices, especially Mr. Justice Douglas, but never a majority of the Court, have agreed with his position.[40] Many constitutional scholars who have studied the subject in depth do not agree with Mr. Justice Black's reading of the legislative history.[41]

Over the years, however, regardless of Barron v. Baltimore, Twining v. New Jersey, Palko v. Connecticut, and Adamson v. California, the Supreme Court has held most of the guarantees of the Bill of Rights to be requirements of due process.[42] In reaching this result the

39. "Selective incorporation does not so clearly require overruling the consistent, often reaffirmed, and almost unanimous jurisprudence of the Court for nearly a hundred years. And since it does not involve automatic absorption of the whole of the Bill of Rights, selective incorporation permits the abandonment, as regards the states, of one or more provisions of the Bill of Rights that seems less important and would be too onerous—say, that dated provision in the seventh amendment requiring a jury trial in civil cases where the value in controversy exceeds twenty dollars." Henkin, "Selective Incorporation" in the Fourteenth Amendment, 73 Yale L.J. 74, 76 (1963).

40. Justices Black, Douglas, Murphy, and Rutledge dissented in *Adamson, supra.* Although Justice Douglas concurred with Justice Black in *Adamson* and again in *Rochin,* his position may not have been based on legislative history. Concurring in Rochin v. Calfornia, 1952, 342 U.S. 165, 179, 72 S.Ct. 205, 213, 96 L.Ed. 183, he stated with respect to the Fifth Amendment: "If it is a requirement of due process for a trial in the federal courthouse, it is impossible for me to say it is not a requirement of due process for a trial in the state courthouse."

41. In the leading study in depth of the legislative history of the Fourteenth Amendment as it relates to incorporation of the Bill of Rights in the amendment, the author concluded that the record "overwhelmingly" refuted Mr. Justice Black's thesis. Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan.L.Rev. 5 (1949). See also a companion article corroborating Fairman's findings. Morrison, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Judicial Interpretation, 2 Stan.L.Rev. 140 (1949). Fairman's study may be subject to the criticism Justice Black belatedly pointed out in *Duncan,* that "Professor Fairman's 'History' relies very heavily on what was *not* said, . . . and most importantly, by the men who actually sponsored the Amendment in the Congress." 391 U.S. at 165, 88 S.Ct. at 1455–1456. In *Duncan* Justice Harlan, dissenting with Justice Stewart, accepted Fairman's study of the legislative history. After Justice Frankfurter retired from the bench, he published a paper restating his views on incorporation. Frankfurter, Memorandum on "Incorporation of the Bill of Rights Into the Due Process Clause of the Fourteenth Amendment", 78 Harv.L.Rev. 746 (1965).

42. *See* Chicago, B. & Q. R. Co. v. Chicago, 1897, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979; Fiske v. Kansas, 1927, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108; Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Malloy v. Hogan, 1964, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed. 2d 653; Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; Klopfer v. North Carolina, 1967, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1; In re

Court has characterized the particular guarantee in question as one of the " 'fundamental principles of liberty and justice which lie at the base of all *our* civil and political institutions.' "; [43] "basic in *our* system of jurisprudence" ; [44] "implicit in the concept of Anglo-American] ordered liberty",[45] and "fundamental to the *American* scheme of justice."[46] The emphasis on the *American* scheme of justice seems to represent a shift from the notion that the Bill of Rights is part of the fundamental rights without which there could be no civilized system of justice. The shift is not so much toward Justice Black's theory of total incorporation of the Bill of Rights into the Fourteenth Amendment as of 1791 or toward Mr. Justice Brennan's theory of selective incorporation. It is a shift toward pragmatic recognition of what is a fair trial in the kind of system that is developing here and now and for the future. There is play in the joints for experimentation by states in their procedural processes. There is less reliance on the literal language or the specifics of the Bill of Rights. It is inconceivable, for example, that in 1972 the Court should hold that prosecution must be by indictment of a grand jury; half of the states allow prosecution on information. Jury trial in criminal cases is necessary—but only in cases that, were they to be tried in a federal court, would come within the Sixth Amendment's guarantee. Duncan v. Louisiana, 1968, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491. The Constitution, however, does not distinguish between serious and petty offenses. Moreover, in determining whether an offense is a petty offense that constitutionally may be tried without a jury the severity of the penalty as well as the moral character of the act should be considered.

As Mr. Justice White made clear in Duncan v. Louisiana, procedural "proc-

Oliver, 1948, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682; Pointer v. Texas, 1965, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923; Washington v. Texas, 1967, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019.

*See* Cushman, Incorporation, Due Process and the Bill of Rights, 51 Corn.L.Q. 467 (1966) ; Lacy, The Bill of Rights and the Fourteenth Amendment: The Evolution of the Absorption Doctrine, 23 William & Mary L.Rev. 37 (1966) ; Henkin, "Selective Incorporation" in the Fourteenth Amendment, 73 Yale L.J. 74 (1963) : Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan.L.Rev. 5 (1949). See especially Justice Harlan's dissent in Duncan v. Louisiana, 1968, 391 U.S. 145, 162, 88 S. Ct. 1444, 20 L.Ed.2d 491. See also articles cited in fn. 41 and the exchange of views between Professors Fairman, and Crosskey in volumes 21 and 22, U.Chi. L.Rev. (1953–54).

In Powell v. Texas, 1968, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254, Justice Marshall's opinion refers to "the Eighth Amendment as applied to the States through the Fourteenth Amendment," while Justice Fortas's opinion refers to "the Eighth Amendment, made applicable to the States through the Fourteenth Amendment." In Mancusi v.

De Forte, 1968, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154, Justice Harlan's majority opinion refers to the respondent's, "Fourth and Fourteenth Amendment rights" and thereafter refers to the Fourth Amendment exclusively. In Board of Educ. v. Allen, 1968, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060, Justice White in the majority opinion formulated the question as whether the state law under review was "in conflict with the First and Fourteenth Amendments." In Sibron v. New York, 1968, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917, Chief Justice Warren said that the case presented "questions under the Fourth and Fourteenth Amendments," while, in the related case of Terry v. Ohio, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889, the Chief Justice referred to "the Fourth Amendment, made applicable to the States by the Fourteenth."

43. Powell v. Alabama, 1932, 287 U.S. 45, 67, 53 S.Ct. 55, 63, 77 L.Ed. 158.

44. In re Oliver, 1948, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682.

45. Palko v. Connecticut, 1937, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288, 292.

46. Duncan v. Louisiana, 1968, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491, 496.

esses are not imaginary and theoretical schemes but actual systems" and the issue is "whether given [the] kind of system [we have in the states today] a particular procedure is fundamental—whether, that is, a procedure is necessary to an Anglo-American regime of ordered liberty". 391 U.S. at 149, fn. 14, 88 S.Ct. at 1448. Justice White's criterion is one that embraces "the common-law system that has been developing contemporaneously in England and in this country".[47]

In Williams v. Florida, 1970, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446, Mr. Justice White, again writing for the Court, held that "the 12-man panel is not a necessary ingredient of 'trial by jury' and that [the State of Florida's] refusal to impanel more than six men provided for by Florida law did not violate petitioner's Sixth Amendment rights as applied to the States through the Fourteenth". Mr. Justice Harlan put his finger on a vital point. In *Duncan* he had observed, "Neither history, nor sense, supports using the Fourteenth Amendment to put the States in a constitutional straitjacket with respect to their own development in the administration of criminal or civil law". 391 U.S. at 175, 88 S.Ct. at 1463. Dissenting in *Williams,* Justice Harlan declared that "we now witness the first major attempt to wriggle free of that 'straitjacket' ". 399 U.S. at 130, 90 S.Ct. at 1922.

*Williams, Duncan,* and many of the leading decisions involving selective incorporation or *selective applicability* of the specifics of the first eight amendments related to substantive rights or to procedures in criminal cases. "The purpose of the jury trial, as [the Court] noted in *Duncan,* is to prevent oppression by the Government". *Williams,* 399 U.S. at 100, 90 S.Ct. at 1905. The civil

---

47. In discussing the applicability to the States of the Sixth Amendment right to jury trial in *criminal* cases, the Court said:

> In one sense recent cases applying provisions of the first eight Amendments to the States represent a new approach to the "incorporation" debate. Earlier the Court can be seen as having asked, when inquiring into whether some particular procedural safeguard was required of a State, if a civilized system could be imagined that would not accord the particular protection. . . . The recent cases, on the other hand, have proceeded upon the valid assumption that state criminal processes are not imaginary and theoretical schemes but actual systems bearing virtually every characteristic of the common-law system that has been developing contemporaneously in England and in this country. The question thus is whether given this kind of system a particular procedure is fundamental—whether, that is, a procedure is necessary to an Anglo-American regime of ordered liberty. . . . Of each of these determinations that a constitutional provision originally written to bind the Federal Government should bind the States as well it might be said that the limitation in question is not necessarily fundamental to fairness in every criminal system that might be imagined but is fundamental in the context of the criminal processes maintained by the American States.

Duncan v. Louisiana, 391 U.S. at 149, fn. 14, 88 S.Ct. at 1447–1448.

Again,

> In neither Palko [v. Connecticut, 1937, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288] nor Snyder [v. Massachusetts, 1934, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674] was jury trial actually at issue, although both cases contain important dicta asserting that the right to jury trial is not essential to ordered liberty and may be dispensed with by the States regardless of the Sixth and Fourteenth Amendments these observations, though weighty and respectable, are nevertheless dicta, unsupported by holdings in this Court that a State may refuse a defendant's demand for a jury trial when he is charged with a serious crime. Perhaps because the right to jury trial was not directly at stake, the Court's remarks about the jury in Palko and Snyder took no note of *past or current developments regarding jury trials, did not consider its purposes and functions, attempted no inquiry into how well it was performing its job, and did not discuss possible distinctions between civil and criminal cases.* (emphasis supplied)

391 U.S. at 155, 88 S.Ct. at 1450.

jury serves a different purpose and its utility is far more controversial.[48] It enjoyed less prestige than the criminal jury in English law in 1791 and today enjoys little or no prestige in England, except in a few strictly defined types of cases.

We conclude from our review of the law that the Supreme Court has examined each claim to a Bill of Rights guarantee on its own merits. The existence of the Seventh Amendment is evidence that in 1791 the jury in suits at common law, but not in other suits, was essential to civil process in the federal courts. But the adoption of the Fourteenth Amendment did not mechanistically make the Seventh Amendment applicable to the States. As Justice Moody put it in *Twining*:

> It does not follow, however, that a procedure settled in English law at the time of the emigration, and brought to this country and practiced by our ancestors, is an essential element of due process of law. If that were so,

the procedure of the first half of the seventeenth century would be fastened upon the American jurisprudence like a straight jacket, only to be unloosed by constitutional amendment. That, said Mr. Justice Matthews, [in Hurtado] "would be to deny every quality of the law but its age, and to render it incapable of progress or improvement." 211 U.S. at 101, 29 S.Ct. at 20.

Justice Matthews continued,

> "It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and Persians." 110 U.S. at 529, 4 S.Ct. at 117.

These expressions of Justices Moody and Matthews are consistent with Mr. Justice White's approach in *Williams*. They are attuned to John Marshall's unforgettable words: "We must never forget that it is a constitution we are expounding." McCulloch v. Maryland, 4 Wheat. (17 U.S.) 316, 407, 4 L.Ed. 579.

48. For particularly critical appraisals of trial by jury in civil actions see, e. g. Frank, Law and the Modern Mind 170–85 (1930); Frank, Courts on Trial (1949); Lummus, Civil Juries and the Law's Delay, 12 B.U.L.Rev. 487 (1932); Zeisel, Kalven & Buckholz, Delay in the Court 71–81 (1959); Peck, Do Juries Delay Justice? 18 F.R.D. 455 (1956); Desmond, Juries in Civil Cases—Yes or No?, 47 J.Am.Jud.Doc. 219 (1964); Cong. Digest (Aug.-Sept. 1971).

See also Kalven & Zeisel, The American Jury (1966); Sidgwick, The Elements of Politics 498 (4th ed. 1919); Hood, A New Fundamental Right, 16 La. Bar J. 233 (1968); Pound, Law in Books and Law in Action, Am.L.Rev., v. 44, p. 12 (1910); Sunderland, Verdicts, General and Special, Yale L.J., v. 29, p. 253 (1920); Wigmore, A Program for the Trial of a Jury Trial, J.Am.Jud.Soc., v. 12, p. 166 (1929); Green, Judge and Jury (1930); Curtis, The Trial Judge and the Jury, Vand.L.Rev., v. 5, p. 150 (1952); Wyzanski, A Trial Judge's Freedom and Responsibility, Harv.L.Rev., v. 65, p. 1281 (1953); Devlin Trial by Jury (1956); Williams, The Proof of Guilt (3d ed. 1963); Rashkow, Abolition of Civil Jury: Proposed Alternatives, 15 DePaul L.Rev. 416 (1966); Kreindler, The Jury System in Tort Cases: Some Misconceptions

Considered, 51 A.B.A.J. 736 (1965); Summers, Some Merits of Civil Jury Trials, 39 Tul.L.Rev. 3 (1964); Sarpy, Civil Juries, Their Decline and Eventual Fall, 11 Loyola L.Rev. 243 (1963); Hogan, Some Thoughts on Juries in Civil Cases, 50 A.B.A.J. 753 (1964); Harlan, The Bill of Rights and the Constitution, 50 A.B.A.J. 919 (1964); Tamm, A Proposal for Five-Member Civil Juries in the Federal Courts, 50 A.B.A.J. 162 (1964); White, Origin and Development of Trial by Jury, 29 Tenn.L.Rev. 8 (1961); The Jury System in Federal Courts—Report of the Judicial Conference Committee on the Operation of the Jury System, 26 F.R.D. 411, et seq. (1960); Holtzoff, Modern Trends in Trial by Jury, 16 Wash. & Lee L.Rev. 27 (1959); Palmer, On Trial: The Jury Trial, 20 F.R.D. 65 (1956); McLaughlin, Needed Improvements to our Jury System, 16 F.R.D. 481 (1951); Rossman, The Judge-Jury Relationship in the State Courts, 3 F.R.D. 98 (1943); . . . L. Green, Judge and Jury (1930); Joiner, Civil Justice and the Jury (1962). An extensive bibliography is found in Hearing Before the Subcommittee to Investigate the Administration of the Internal Security Act of the Senate Committee on the Judiciary, 84th Cong., 1st Sess., pp. 63–81 (1955).

## IV. LINE OF DEVELOPMENT

A. The limitation of the Seventh Amendment to suits at common law, thereby eliminating jury trials in suits in equity and admiralty, is in itself evidence that historically the Framers considered a fair trial could be had without a jury in broad groups of civil cases.

Equity cases often involve issues similar to those tried by jury in common law actions, for example, cases in which the relief sought is specific performance of a contract, not damages. Thus, the presence of a jury in common law suits is based on an accident of history, as Mr. Justice White said with respect to the 12-man jury, rather than a rational distinction based on the merits of juries and the difference between the common law and equity. Consider the serious consequences of an equitable decree. Failure to comply with an injunction subjects the contemnor to a jail sentence—again without a jury. This deprivation of liberty without trial by jury is a result more important to the individual and to society than a judgment for damages. The line between suits in equity and suits at common law has often been difficult to draw, and it has often been drawn to the derogation of the right to jury trial. *See* James, Right to a Jury Trial in Civil Actions, 72 Yale L.J. 655 (1963); Karlen, "Can a State Abolish the Civil Jury?" 1965 Wisc.L.Rev. 103 (1965). When, therefore, we deal with the essential ingredients of due process today— not the 1791 ingredients of a trial at common law—Mr. Justice Cardozo's words in *Palko* are especially pertinent: "Few would be so narrow or provincial as to maintain that a fair and enlightened system of justice would be impossible without [the right to trial by jury]".

B. The encroachments on the civil jury occasioned by classification of cases as outside of the "Suits at common law" category has been exceeded only by encroachments brought about by total abolition of the civil jury. This occurs in specialized courts and administrative agencies as well as in certain types of cases defined by statute despite the common law nature of some of the suits before the courts or agencies covered by the legislation. The National Labor Relations Board,[49] the Tax Court,[50] the Court of Claims,[51] the Patent Office,[52] and the Interstate Commerce Commission[53] make judicial or quasi-judicial determinations without a jury. Suits under the Federal Tort Claims Act[54] are heard without a jury, as are divorce actions,[55] workmen's compensation claims,[56] and claims against state governments.[57] The National Bankruptcy Act,[58] the Tucker Act,[59] and the Longshoremen's and Harbor Workers' Act[60] do not include jury trial provisions. Obviously, many of the cases heard by these tribunals and many of the claims under this legislation are not "suits at common law" in the 1791 sense (although some are) and literally, are not covered by the Seventh Amendment. We are concerned, however, with due process,

49. 29 U.S.C. § 151 et seq.; NLRB v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 48–49, 57 S.Ct. 615, 81 L.Ed. 893.

50. 26 U.S.C. § 7403.

51. 28 U.S.C. § 2505; United States v. Sherwood, 1941, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058.

52. 35 U.S.C. § 23.

53. 49 U.S.C. § 17.

54. 28 U.S.C. § 2402; *see* United States v. Sherwood, 1940, 312 U.S. 584, 61 S. Ct. 767, 85 L.Ed. 1058.

55. *See, e. g.*, McLachlan v. McLachlan, 1929, 101 Cal.App. 106, 281 P. 512.

56. Mountain Timber Co. v. Washington, 1917, 243 U.S. 219, 37 S.Ct. 260, 61 L. Ed. 685; N. Y. Cent. R. R. Co. v. White, 1917, 243 U.S. 188, 37 S.Ct. 247, 61 L. Ed. 667; Grand Trunk W. R. R. Co. v. Industrial Comm., 291 Ill. 167, 125 N.E. 748 (1919); Cunningham v. Northwestern Improvement Co., 44 Mont. 180, 119 P. 554 (1911); Adams v. Iten Biscuit Co., 63 Okl. 52, 162 P. 938 (1917).

57. *See, e. g.*, Maloney v. State, 207 Misc. 894, 141 N.Y.S.2d 207 (Ct.Cl.1955).

58. 11 U.S.C. § 1 et seq.

59. 28 U.S.C. §§ 1346 and 2402.

60. 33 U.S.C. § 901 et seq.

i. e. whether the right to a jury trial in civil cases is fundamental to the American system of civil justice. The conscious decision of Congress and of state legislatures to omit or to preclude the jury right and the assumptions which underlie the judicial decisions sustaining the omissions and creating new areas where jury trial is absent reinforce our belief that the right to jury trial is not an essential ingredient of due process.

C. In federal courts, where the right to jury trial in civil cases is guaranteed by the Seventh Amendment,[61] and in many state courts the right has been severely undercut. The verdict of a civil jury need no longer be unanimous in many states. A verdict may be rendered by three-fourths,[62] five-sixths,[63] ten-twelfths,[64] or a majority of the jurors.[65] *See* Minneapolis & St. L. R. R. Co. v. Bombolis, 1916, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961. At least thirty-seven states have in some manner and for certain cases legitimized civil juries of less than the traditional twelve jurors;[66] while three states require civil juries of reduced size.[67]

Numerous district courts by rule or by order have fixed the number of jurors in some civil cases at less than the traditional twelve. (See Appendix B.) In addition, the parties may stipulate to a reduced jury in federal court. *See* F.R. Civ.Pro. 48. Rule 38 of the Federal Rules of Civil Procedure provides that failure to demand a jury trial constitutes waiver and would seem to legitimize jury waiver

---

61. We assume that due process would not require *more* of the state courts than it does of the federal courts although it might conceivably require less. See generally, Lumbard, Trial by Jury and Speedy Justice, 28 Wash. & Lee L.Rev. 309 (1971) ; Holtzoff, Modern Trends in Trial by Jury, 16 Wash. & Lee L.Rev. 27 (1959) ; Karlen, Can A State Abolish the Civil Jury?, 1965 Wis.L.Rev. 103 (1965).

62. Ariz.Rev.Stat.Ann. § 21–102 (1956) ; Ky.Rev.Stat.Ann. § 29.015 (1963) ; Ohio Const. art. 1 § 5, Implemented by Ohio Rev.Code Ann. § 1901.24 (Baldwin 1964).

63. N.Y.Const. art. 1, § 2, Implemented by N.Y.Civ.Prac.Law R. 4113 (McKinney 1963).

64. Mich.Const. art. 1, § 14.

65. Del.Super.Ct. (Civ.R. 48 ; Md.R. of Proc. 544 ; N.J.R. 449–1 and Rules Governing The Courts of the State of New Jersey 1 :8–2.
*See* also Lumbard, Trial by Jury and Speedy Justice, 28 Wash. & Lee L.Rev. 309 (1971) ; Kronzer & O'Quinn, Let's Return to the Majority Rule in Civil Jury Cases, 8 Hous.L.Rev. 302 (1970) ; Zeisel, . . . And Then There were None: The Diminution of the Federal Jury, 38 U.Chi.L.Rev. 710 (1971).

66. Ariz.Rev.Stat.Ann. 21–102 (1956) ; Ark. Stat.Ann. § 26–608 (1947) ; Cal.Civ. Proc.Code § 194 ; Colo. § 51–133 (1958) ; Del.Super.Ct. (Civ.) R. 48 ; Ga.Code Ann. § 6–403 (1935) ; Idaho Code Ann. § 2–105 (1947) ; Ill.Ann.Stat. ch. 79, § 49 (Smith-Hurd 1935) ; Ind.Ann.Stat. § 2–2001 (1933) ; Iowa Code Ann. § 603.34 (1950) ; Kan.Gen.Stat.Ann. § 20–812 (1949) ; Ky.Rev.Stat.Ann. § 29.015 (1955) ; Md.Rules of Proc. 544 ; Mich. Comp.Laws §§ 730.23, 730.267 (1948) ; Minn.Stat.Ann. § 488.21 (1957) ; Miss. Code Ann. § 1836 (1956) ; Mo.Ann.Stat. § 512.310 (1952) ; Mont.Rev.Codes Ann. § 93–1205 (1947) ; Neb.Rev.Stat. § 26–183 (1943) ; Nev.Rev.Stat. § 16.030 (1957) ; N.J.Rules 4:49–1 ; N.M.Stat. Ann. § 21–1–1(48) (a) (1953) ; N.Y. Justice Ct.Act § 230 ; N.C.Gen.Stat. § 7–152 (1953) ; N.D.Cent.Code § 33–07–08 (1960) ; Ohio Rev.Code Ann. § 1901.24 (Page 1957) ; Okla.Stat.Ann. tit. 11, § 843 (1951) ; Ore.Rev.Stat. § 17.105 (1953) ; Pa.Stat.Ann. tit. 42, § 691 (1930) ; S.C.Code § 15–618 (1952) ; Vernon's Tex.Rev.Civ.Stat.Ann. art. 2191 (1925) ; Vt.Stat.Ann. tit. 12 § 1505 (1959) ; Wash.Rev.Code §§ 2.36.050, 4.-44.120 (Supp.1956) ; W.Va.Code Ann. § 5000 (1955) ; Wis.Stat.Ann. § 270.15 (3) (1957) ; Wyo.Stat.Ann. § 1–552 (1957).
See also Wiehl, The Six-Man Jury, 4 Gonzaga L.Rev. 35, 41 (1968) Tamm, The Five-Man Civil Jury: A Proposed Constitutional Amendment, 51 Geo.L.J. 120, 137 (1962).

67. Fla.Stat.Ann. § 54.14 (1943) (six jurors) ; Utah Const. art. I, § 10 (eight jurors) ; Va.Code Ann. § 8–193 (seven jurors).

in civil cases.[68] Finally, Rule 53 allows certain cases and certain issues to be heard by a master rather than a jury.

D. An examination of the jury in criminal cases is relevant to our inquiry. A distinction can, of course, be drawn between the right to a jury trial in criminal cases and the right in civil cases. In criminal cases, the liberty of the accused is at stake; courts zealously protect the freedom of the accused by incarcerating him only if a jury finds his conduct reprehensible. No similar right can necessarily be inferred in a civil case between party and party where only property is at stake. *See* Henderson, The Background of the Seventh Amendment, 80 Harv.L.Rev. 289 (1966); Karlen, Can a State Abolish the Civil Jury?, 1965 Wisc.L.Rev. 103 (1965).

As previously noted, the Supreme Court has approved juries of less than twelve in state criminal cases. Williams v. Florida, 1970, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446. Two states allow convictions for serious crimes by less than a unanimous jury,[69] although the constitutionality of these provisions is still in doubt.[70] Several other states allow criminal verdicts for offenses below the grade of felony to be rendered by less than a unanimous jury.[71] There

is a category of crimes, sometimes referred to as "petty" offenses, which do not require jury trial at all despite the Supreme Court's pronouncements that a jury trial in criminal cases is required by due process.[72]

In theory, if not in practice, the wayward minor in Juvenile Court is not in a criminal court. A strange split personality exists in decisions on the juvenile courts. In re Gault, 1967, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, is replete with language about the necessity of guaranteeing due process rights to juveniles.[73] Yet, when the Supreme Court was presented with the question of a juvenile's right to jury trial, the Court held that due process did not require a jury trial. McKeiver v. Pennsylvania, 1971, 403 U.S. 528, 540, 91 S.Ct. 1976, 1984, 29 L.Ed.2d 647. This holding vividly illustrates the fact that the right to a jury trial is not so "fundamental to the American scheme of justice" as to be required at all times, in a certain form, or in all types of cases.

These examples from the criminal area demonstrate that a right considered "fundamental" may be modified or abolished altogether. Even if we were to decide that the right to a jury trial in civil cases is a requirement of due proc-

68. (d) Waiver. The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.
Fed.R.Civ.Pro. 38(d); *cf.* Capital Traction Co. v. Hof, 1899, 174 U.S. 1, 19 S. Ct. 580, 43 L.Ed. 873.

69. La.Const. art. 7, § 41: La.Crim.Proc. Code Ann. art. 782 (West 1967). Ore. Const. art. 1, § 11; Ore.Rev.Stat. §§ 136.330, 136.610 (1967).

70. Johnson v. Louisiana, No. 5161, prob. juris. noted, 400 U.S. 900, 91 S.Ct. 144, 27 L.Ed.2d 137 (1970); Apodaca v. Oregon, No. 5338, cert. granted, 400 U.S. 901, 91 S.Ct. 145, 27 L.Ed.2d 138 (1970).

71. Mont.Const. art. 3, § 23.
Okla.Const. art. 2, § 19, Okla.Stat. Ann. tit. 11, §§ 958.3, 958.6 (Supp.

1969–70), tit. 21, § 10 (1958); Tex. Const. art. 5, § 13, Vernon's Ann.St. Idaho Const. art. 1, § 7.

72. *See* Duncan v. Louisiana, 1968, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491; Dyke v. Taylor Implement Mfg. Co., 1968, 391 U.S. 216, 88 S.Ct. 1472, 20 L. Ed.2d 538; Bloom v. Illinois, 1968, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522; Cheff v. Schnackenberg, 1966, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629; Baldwin v. New York, 1970, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437; Frank v. United States, 1969, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162.

73. *See also* Haley v. Ohio, 1948, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; Gallegos v. Gallegos, 1962, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325; Kent v. United States, 1966, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84; DeBacker v. Brainard, 1969, 396 U.S. 28, 90 S.Ct. 163, 24 L. Ed.2d 148; In re Winship, 1970, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368.

ess, the Louisiana modification of that alleged right would not necessarily be ·constitutionally impermissible. The Louisiana statutes challenged here cannot be considered "unreasonable or arbitrary", in the light of the historical origin and line of development of the cases involving the right to a jury. Hardware Dealers Mutual Fire Ins. Co. v. Glidden, 1931, 284 U.S. 151, 158, 52 S.Ct. 69, 76 L.Ed. 214, 219.

E. There is language in Supreme Court opinions about the fundamental nature of the right to jury trial and the presumption in favor of the right in civil cases. See Jacob v. New York, 1942, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166. The Court has broadened the class of cases and issues where jury trial exists as of right [74] and has held that the federal policy favoring jury trial applies in diversity cases even though the state courts would deny a jury trial.[75] A recent line of Supreme Court cases indicates a tendency on the part of the Court to apply the principles of the Seventh Amendment to state civil cases.[76] In Gallick v. Baltimore & Ohio R. R. Co., 1963, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed. 2d 618, the petitioner obtained a jury verdict in state court in a suit against his employer under the Federal Employers' Liability Act. The state appellate court reversed, finding "no direct evidence" of negligence. After the state supreme court refused review, the United States Supreme Court granted certiorari to consider whether the state appellate court had "improperly invaded the jury's function". The Court held that there was sufficient evidence to go to the jury and

that the state court had erred in making a further examination of the jury's findings. See also Rogers v. Mo. Pac. R. R. Co., 1957, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493. Suits under the Federal Employers' Liability Act are of course not "Suits at common law" so the Seventh Amendment is not applicable even in a federal court, and the FELA does not require jury trial. Yet the Court has held that jury trial is guaranteed when suits under that act are filed in state court, and state appellate courts may not re-examine jury findings. The same rule has been applied by the Supreme Court to suits in state court under the Jones Act and the Boiler Inspection Act.[77] Although these cases are clearly distinguishable from the cases at bar in that they involve federally-created rights sued upon in state court, one could argue that the same "common law tradition" embodied in the Seventh Amendment which has been used to require jury trial in these statutory causes of action should be applied to all state court civil trials.

But another line of Supreme Court cases has re-examined facts found by a jury in state courts despite the "common law tradition" favoring jury trial and despite the fact that the cases involved "Suits at common law". In New York Times v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, petitioner sued for libel in state court and received a favorable jury verdict. After the state appellate courts had affirmed, the Supreme Court granted certiorari to determine free speech and free press limitations on libel actions brought by public officials. The Court fashioned a federal

---

**74.** See Beacon Theatres v. Westover, 1959, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988; Dairy Queen v. Wood, 1962, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44; McCoid, Procedural Reform and the Right to Jury Trial: A Study of Beacon Theatres, Inc. v. Westover, 116 Penn.L. Rev. 1 (1967).

**75.** Byrd v. Blue Ridge Rural Electric Coop., 1958, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953; Simler v. Connor, 1963, 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691.

**76.** For an extended discussion of the material which follows, see, Hood, A New Fundamental Right, 16 La.Bar J. 233 (1968).

**77.** See, e. g., Senko v. LaCrosse Dredging Corp., 1957, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404; Harsh v. Ill. Terminal R. R. Co., 1955, 348 U.S. 940, 75 S.Ct. 362, 99 L.Ed. 736; Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L. Ed. 916.

rule requiring "actual malice" in order to allow recovery in such actions. Although the case was reversed on a technical defect in the charge, the Court went on to "review the evidence . . . to determine whether it could constitutionally support a judgment for respondent", 376 U.S. at 284, 84 S.Ct. at 728, and concluded that "the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands, and hence that it would not constitutionally sustain the judgment for respondent under the proper rule of law." 376 U.S. at 285–286, 84 S.Ct. at 729. The Supreme Court applied neither the *Gallick* rule nor the "common law tradition" but re-examined the facts.[78] *See also* Associated Press v. Walker, 1967, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094; Time, Inc. v. Hill, 1967, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456; Rosenblatt v. Baer, 1966, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597.

F. Much has been written, favorable and unfavorable, about the jury.[79] The question before this Court is not *should* a state abolish the jury trial but rather *could* it constitutionally do so. If the question of "how well it [is] performing its job" (Duncan v. Louisiana, 1968, 391 U.S. 145, 155, 88 S.Ct. 1444, 1450, 20 L.Ed.2d 491) is relevant,[80] we need point only to the monumental delay in the civil court system, the wasted time for judges, jurors, and litigants, as well as the expense, discussed by many who have evaluated the civil jury system.[81]

■ In summary, we adhere to a pragmatic approach that, absent "total incorporation", a civil jury trial is not so implicit in the concept of ordered liberty in a cooperative federalism as to be required of the states by due process. We further hold that, assuming the right to a civil jury trial is required by due process, the Louisiana scheme does not destroy that right, but modifies it in accordance with fair procedures many of which are analogous to procedures established in the Federal Rules of Civil Procedure.

## IV. RE-EXAMINATION OF FACTS

■ A. This leads us to consider whether jury trial without re-examination of facts—the principle embodied in the second clause of the Seventh Amendment—is so fundamental to the American scheme of justice as to constitute a necessary ingredient of due process. We hold, in view of the ever-changing nature of the judge-jury division of functions, that the principle embodied in the second clause of the Seventh Amendment is not required of the States by due process.

As noted earlier, at the time of the passage of the Seventh Amendment, state practices varied as to the right to jury trial and the court-jury functions.[82] In succeeding years, the judge-jury relationship has been constantly changing in federal courts and state courts in the direction of diminishing the role of the jury as finder of fact.

The Federal Rules of Civil Procedure contain many such examples. For instance, Rule 59 allows the trial judge on motion of the parties, Fed.R.Civ.Pro. 59(a), or on his own initiative, Fed.R. Civ.Pro. 59(b), to grant a new trial. This

---

78. The opinion could also be read as finding insufficient evidence as a matter of law.

79. See footnote 48.

80. *Duncan* considers efficiency both in distinguishing petty offenses from those requiring jury trial, 391 U.S. at 160, 88 S.Ct. 1444, and in explaining the inapplicability of *Palko* and *Snyder*, 391 U.S. at 155, 88 S.Ct. 1444.

81. *But see* Kalven, The Dignity of the Civil Jury, 50 Va.L.Rev. 1055 (1964).

Professor Kalven estimates that "on the average a bench trial would be 40 per cent less time consuming than a jury trial of the same case" yet concludes:

> If the case against the jury is that its abolition is to be considered a remedy for court congestion, then the proper topic is court congestion and what else can be done about it.

82. *See* Henderson, The Background of the Seventh Amendment, 80 Harv.L.Rev. 289 (1966); Hamilton, The Federalist, Nos. 81, 83, and 88.

includes the power to grant a new trial when "the verdict [is] against the weight of the evidence." Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 249, 61 S.Ct. 189, 193, 85 L.Ed. 147, 153. Although the determination whether to grant a new trial for this reason is often denominated a "question of law", it must necessarily involve a reassessment of facts. So too, when a trial court grants a motion for judgment notwithstanding the verdict, under Rule 50(b), on the basis of insufficiency of the evidence (see Montgomery Ward & Co. v. Duncan), it must necessarily involve re-examination of facts despite the "legal" nature of the question presented. Further, when an appellate court grants a motion for judgment notwithstanding the verdict after a jury trial (see Neely v. Martin K. Eby Constr. Co., 1967, 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75) it is technically issuing a delayed ruling on a motion for directed verdict; yet the ruling must necessarily involve fact re-examination.

Under Rule 50(a), the trial judge may grant a motion for directed verdict "without any assent of the jury". Before granting such a motion, the judge must examine the facts or absence of facts before the jury. Justices Black and Douglas have called this provision part of "the process by which the courts have been wresting from juries the power to render verdicts".[83] At the very least, the granting of a motion for directed verdict involves a shifting of the court-jury function in a jury trial.

The granting of a motion for summary judgment under Rule 56 on the basis of affidavits, see Rule 56(e), makes the judge the trier of fact in a very real sense. Similarly, an order of dismissal for failure to prosecute under Rule 41(b) seriously undermines the right to jury trial. The power of an appellate court to grant a motion for a new trial is codi-

fied in Rule 50(c). Before granting such a motion, the appellate court must re-examine facts. Justices Black and Douglas have commented, "To the extent that jury verdicts are to be set aside and new trials granted, we believe that those who hear the evidence, the trial judges, are the ones who should primarily exercise such discretion".[84]

Finally, special verdicts, see Rule 49(a), and general verdicts accompanied by answers to interrogatories, see Rule 49(b), involve inroads by the judge into the jury function. Justices Black and Douglas have said:[85]

> One of the ancient, fundamental reasons for having general jury verdicts was to preserve the right of trial by jury as an indispensable part of a free government. Many of the most famous constitutional controversies in England revolved around litigants' insistence, particularly in seditious libel cases, that a jury had the right to render a general verdict without being compelled to return a number of subsidiary findings to support its general verdict. Some English jurors had to go to jail because they insisted upon their right to render general verdicts over the repeated commands of tyrannical judges not to do so. Rule 49 is but another means utilized by courts to weaken the constitutional power of juries and to vest judges with more power to decide cases according to their own judgments. A scrutiny of the special verdict and written interrogatory cases in appellate courts will show the confusion that necessarily results from the employment of these devices and the ease with which judges can use them to take away the right to trial by jury. We believe that Rule 49 should be repealed, not amplified.

There are also several devices, not specifically mentioned in the Rules, by which the court alters the jury's func-

---

83. Statement of Mr. Justice Black and Mr. Justice Douglas on the Rules of Civil Procedure and the Proposed Amendments, 374 U.S. 868, 83 S.Ct. *43*, 9 L.Ed.2d lxv, lxvi. (1963)

84. *Id.*

85. *Id.*

tion. First, the trial judge may decrease the verdict of a jury by requiring a remittitur as a condition of its denying a motion for new trial. *See* Dimick v. Schiedt, 1935, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603.[86] Second, a trial judge may encourage, perhaps strong-arm, the jury to reach a verdict. *See* Allen v. United States, 1896, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528; Thaggard v. United States; 5 Cir. 1965, 354 F.2d 735, cert. denied 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966); United States v. Prentiss, 5 Cir. 1971, 446 F.2d 923; United States v. Williams, 5 Cir. 1971, 447 F.2d 894. Again, the trial judge may, to a certain extent, comment on the evidence. United States v. Philadelphia & Reading R. R. Co., 1887, 123 U.S. 113, 8 S.Ct. 77, 31 L.Ed. 138.

These federal rules illustrate the plastic nature of court control of the jury in civil cases, notwithstanding the apparently unyielding language of the Seventh Amendment.[87] Considering that the strictures of the amendment do not apply to the states except (1) by the "selective incorporation" doctrine based on due process or (2) by the concept of due process as "ordered liberty" (absent any incorporation theory):

[I]t suffices to say that the procedure by which rights may be enforced and wrongs remedied is peculiarly a subject of state regulation and control. The Fourteenth Amendment neither implies that all trials must be by jury, nor guarantees any particular form or method of state procedure. . . . In the exercise of that power and to satisfy a public need, a state may choose the remedy best adapted, in the legislative judgment, to protect the interests concerned, provided its choice is not unreasonable or arbitrary, and the procedure it adopts satisfies the

constitutional requirements of reasonable notice and opportunity to be heard. Hardware Dealers Mutual Fire Ins. Co. v. Glidden, 1931, 284 U.S. 151, 52 S.Ct. 69, 76 L.Ed. 214, 219.

B. The soundness of this federal principle would seem to be peculiarly applicable to procedure in Louisiana. The law of this state is unique. Nevertheless its lawmakers, legislative and judicial, have managed to work out compromise procedures compatible with Louisiana's civilian heritage and with the Anglo-American concept of due process. There is appellate review on the facts as well as on the law, but it is subject to the requirement that factual findings of a trial court or the verdict of a jury should be disturbed only when they are manifestly erroneous. Morris v. Hatch, 2 Mart. (N. S.) 491 (La.1824); Edwards v. Burroughs, 12 Rob. 171 (La.1845); Moret v. N. O. Rys. Co., 112 La. 863, 36 So. 759 (1904); Norman v. State, 69 So.2d 120 (La.App.1953), rev'd 227 La. 904, 80 So.2d 858 (1955); Knighten v. Am. Auto Ins. Co., 121 So.2d 344 (La.App.1960).

Justice (then Judge) Albert Tate has said: "I believe that appellate courts must adhere to the settled jurisprudential rule to which at least lip-service has been paid by a century and a half of Louisiana precedents: that a trial court's factual determinations should be accepted on appellate review, in the absence of manifest error. And we must do so not only because as a practical matter the trial judge is in a better position than is his appellate brethren to evaluate the credibility of witnesses. We must do so also because the proper and efficient operation of our judicial system allots factual determinations primarily to the trial judge and only secondarily to the appellate court, and because the public interest in the swift and authoritative settlement

86. It has been contended that an appellate court may do the same. See Sunray Oil Corp. v. Allbritton, 5 Cir. 1951, 187 F.2d 475, en banc 188 F.2d 751 (dissenting opinions).

87. *See* generally James, Sufficiency of the Evidence and Jury-Control Devices Avail-

able Before Verdict, 47 Vir.L.Rev. 218 (1961) discussing the rules of admission and exclusion of evidence, nonsuit, directed verdict, dismissal, instructions, special verdicts, and interrogatories.

of disputes at law requires it." Tate, Manifest Error—Further Observations on Appellate Review of Facts in Louisiana Civil Cases, 22 La.L.Rev. 605, 614 (1962). There is of course uncertainty as to the scope of the rule. See Hardy, The Manifest Error Rule, 21 La.L.Rev. 749, 1961. It has been suggested that the "clearly erroneous" rule but not the "substantive evidence" rule would be conceptually acceptable in Louisiana. Comment, 21 La.L.Rev. 402 (1961). A recent decision, Herbert v. Travelers Indemnity Co., 193 So.2d 330 (La.App. 4th Cir. 1966), writ refused, 250 La. 365, 195 So.2d 643, established a new basis for remanding a case, because of the "crucial significance" of excluded evidence. This decision may "drastically reduce the effects of appellate review of facts". Note, 41 Tul.L.Rev. 922 (1967).

If the kind of appellate review of the facts that exists in Louisiana is unconstitutional, then the Supreme Court should take a second look at the constitutionality of the Federal Rules.

## V. CONCLUSION

As long as the Supreme Court declines to accept the total incorporation doctrine, there is no rational basis for asserting that due process requires a jury in common law cases in state courts, but that a jury may be dispensed with in equity, admiralty, and numerous types of cases based on statutory causes of action. Historically, we have seen the demise of the civil jury in England and the modification of the civil jury in many states so that today it resembles only remotely the jury in a common law case. The grant of a new trial, directed verdict, summary judgment, judgment notwithstanding the verdict and other federal procedures, in sum, are analogous to the Louisiana procedure for review of the facts. Basic substantive rights in the first eight amendments inseparably as-

sociated with personal liberties or with a fair trial are fundamental components of due process. But the civil jury is procedural; not "inseparably connect[ed with] the existence of liberty."[88] Principles of a viable American federalism would seem to allow the states to work out their own civil procedures when those procedures do not conflict with the preservation of ordered liberty. In addition to substantive rights procedural rights for which no substitute is available are within the due process concept. "But trial by jury (particularly in its rigid common law sense) and grand jury indictment, for which the 'information' has proven a desirable substitute, should be classified as what they are—technical procedures in a state of arrested development, whose evolution must be allowed to continue if it is ever to catch up with the needs of modern society and aspire to serve the needs of modern man."[89]

Judge E. Gordon West dissents and will file reasons therefor at a later date.

## APPENDIX A

Although the consolidated cases present varied factual situations, all ask for injunctive relief to restrain the enforcement by state officials of state statutory or constitutional provisions.

In Melancon v. McKeithen (the Nineteenth Judicial District Court, Parish of East Baton Rouge) the plaintiff filed suit against a property owner, a real estate firm, and their insurers. He alleged that while a business visitor at an "open house" he was beaten by an unidentified stranger. A jury returned a verdict in favor of the plaintiff in the amount of $15,000 upon which judgment was entered. On motion of the defendants, the trial judge granted a new trial under Article 1972 of the Louisiana Code of Civil Procedure,[90] on the

---

88. The Federalist, No. 83 (Hamilton).

89. Cushman, Incorporation of the Bill of Rights, 51 Cornell L.Q. 467, 501.

90. Article 1972 provides that:

> A new trial shall be granted, upon contradictory motion of any party, in the following cases:
> (1) Where the judgment appears clearly contrary to the law and the evidence;

ground that the jury verdict was "contrary to the law and the evidence".[91] The plaintiff brought this suit in federal court asking for the empaneling of a three-judge court and an order reinstating the jury judgment. The complaint alleges broadly that the Constitution and laws of Louisiana deprive the plaintiff of rights secured by the Seventh and Fourteenth Amendments to the United States Constitution by derogating the right to jury trial and allowing re-examination of facts found by a jury. the same result might have been reached under Fed.R.Civ.Proc. 59.

In Hill v. McKeithen (Nineteenth Judicial District Court, Parish of East Baton Rouge), a wife sued her husband's insurer to recover for bodily injuries sustained as a result of her husband's alleged reckless operation of an automobile. A jury trial resulted in a verdict and judgment for $4,000. The First Circuit Court of Appeal for the State of Louisiana, reversed the judgment.[92] The plaintiff then filed suit in federal

court asking for a three-judge court to order the state appellate court to reinstate the jury verdict. The plaintiff alleged deprivation of rights secured by the Seventh and Fourteenth Amendments to the United States Constitution, and specifically challenged Art. 7 § 29 of the Louisiana Constitution allowing state appellate courts to review factual determinations of a jury.[93]

Jones v. Aetna (First Judicial District Court, Parish of Caddo) the plaintiff, as ward for a minor child, sued an insurance company under Louisiana's direct action statute for injuries incurred in an auto accident. A jury trial resulted in a verdict and judgment in favor of the plaintiff in the amount of $6,500 on the issue of damages; liability was admitted. On appeal, the Louisiana Circuit Court of Appeal for the Second Circuit reduced the award to $3,500 and rendered its own judgment for the lesser amount without granting a new trial. An application for writ of certiorari to the Louisiana Supreme Court under Art.

---

(2) Where the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial; or

(3) In jury cases, as provided in Article 1814.

91. The trial judge's "Judgment on Motion for a New Trial" reads, in pertinent part:
The Court, after hearing the motion, being of the opinion that the judgment and verdict of the Jury rendered herein is contrary to the law and the evidence, for the reasons orally assigned:
IT IS ORDERED, ADJUDGED AND DECREED that the verdict of the Jury and the Judgment of the Court in accordance therewith, rendered against the defendants on the 15th day of December 1965 be and the same is set aside and anulled, and a new trial granted in the matter.
His action may be interpreted as a granting of a new trial for insufficiency of the evidence. Such action is appropriate in federal court as consistent with the Seventh Amendment. ' See Fed.R.Civ.Pro. 59 (a) ; Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 61 S.Ct. 189, 85

L.Ed. 147. For purpose of this decision, however, we assume *arguendo* that the action involved re-examination of facts.

92. The court's opinion reads, in pertinent part: "We find the plaintiff failed to sustain the burden of proving that her injuries were caused by the negligent operation of the vehicle in which she was riding. The judgment appealed from must be reversed. . . . Therefore, for the reasons above assigned, the judgment of the trial court is reversed and there is judgment herein in favor of the defendant and against the plaintiff rejecting her demands, at her costs." The action may merely be the granting of a judgment notwithstanding the verdict, approved in federal court, see Fed.R.Civ.Pro. 50(b). However, we shall assume *arguendo* that it involved re-examination of facts.

93. Section 29. . . . All appeals of which the courts of appeal have appellate jurisdiction as provided in this Section shall be on both the law and the facts, except where the appeal is limited to questions of law only by any other Section of this Constitution.
. . .
La.Constit. Art. 7, § 29.

7 § 10 of the Louisiana Constitution [94] was refused.[95] After an application for writ of certiorari to the United States Supreme Court was denied, 389 U.S. 990, 88 S.Ct. 471, 19 L.Ed.2d 482, this suit followed. The plaintiff requests a three-judge court to order the Louisiana Supreme Court to grant the application for writ of certiorari and remand the case to the Court of Appeal for reinstatement of the jury verdict, or order of remittitur only as an alternative to a new trial. The plaintiff in this case again alleges Seventh and Fourteenth Amendment deprivations and specifically challenges Art. 7 § 10 and Art. 7 § 29 of the Louisiana Constitution. *See* footnotes 93 and 94.

In Long v. McKeithen (Nineteenth Judicial District Court) the plaintiff obtained a jury verdict of $6,400. The First Circuit Court of Appeal for Louisiana, in the words of plaintiff's complaint, "set aside judgment because the Court disagreed with the facts as found by the jury". The complaint asks for a three-judge panel to order the state appellate court to reinstate the jury judgment on grounds similar to those alleged in the previous cases.

In Mayes v. Ellis (Nineteenth Judicial District Court) two sets of parents brought similar suits for the wrongful deaths of their daughters caused by a single auto accident. The suits were consolidated for trial, and a jury returned a verdict of $100,000 in favor of the first set of parents and $50,000 in favor of the other parents. The First Circuit Court of Appeal reversed and entered judgment for the defendants after re-examining the facts. Mayes v. McKeithen, 213 So.2d 340 (1968). The Louisiana Supreme Court denied an ap-

plication for writs of certiorari. Mayes v. McKeithen, 252 La. 965, 215 So.2d 130 (1968). The plaintiffs ask a three-judge court to order reinstatement of the jury verdict for reasons similar to those asserted in the previous cases.

In Moticheck v. McKeithen (Nineteenth Judicial District) the First Circuit Court of Appeal set aside a jury verdict in favor of the plaintiff for $2,000 because according to the complaint, "the court disagreed with the facts as found by the jury".

In Davis v. McKeithen (Civil District Court for the Parish of Orleans) the plaintiff, on behalf of minor children, sued a landlord and his insurer for damages sustained by her children resulting from ingesting paint from the premises of the defendant. The jury awarded damages totaling $117,500.00. The Fourth Circuit Court of Appeal affirmed. The Supreme Court of Louisiana, however, reversed on a question of fact.

Finally, in Lewis v. Ford Motor Company (Eleventh Judicial District Court for the Parish of Sabine) a widow sued on behalf of herself and two minor children for the death of her husband in an automobile accident. The jury awarded damages totalling $125,000.00. On appeal, the Third Circuit Court of Appeal reviewed the facts of the case and reversed the judgment rendered on the jury's verdict as to four of the defendants. The plaintiff's application for Writ of Review and Certiorari to the Louisiana Supreme Court was refused.

### APPENDIX B

The following district courts, by rule or order, have fixed the number of jurors

---

94. Section 10. The Supreme Court has control of, and general supervisory jurisdiction over all inferior courts. . . . In civil cases, its appellate jurisdiction extends to both the law and the facts. In criminal matters, its appellate jurisdiction extends to questions of law only. . . .
La.Constit. Art. 7, § 10.

95. The Louisiana Supreme Court stated: Writ refused. On the facts found by the Court of Appeal, we find no error of law in its judgment.
Jones v. Aetna Casualty & Surety Company, 250 La. 930, 199 So.2d 926 (1967).

in some civil cases at less than the traditional twelve:

1. *Minnesota* (November 12, 1970)
   "In all civil jury cases, jurisdiction for which is based on 28 U.S.C. § 1332, 45 U.S.C. § 51, and 46 U.S.C. § 688, the jury shall consist of six members." (Effective January 1, 1971)

2. *Illinois, Eastern* (December 10, 1970)
   "In all civil jury cases the jury shall consist of six members." (Effective September 1, 1971)

3. *Illinois, Southern* (January 21, 1971)
   "In all jury cases, except as may be otherwise expressly required by law or controlling rule, the jury shall consist of six members." (Effective May 1, 1971)

4. *Florida, Southern* (February 8, 1971)
   ". . . all civil jury cases, jurisdiction for which is based upon 28 U.S.C. § 1332, 45 U.S.C. § 51, and 46 U.S.C. § 688, shall be tried to a jury which shall consist of six members." (Effective March 1, 1971)

5. *Kentucky, Western* (February 17, 1971)
   "In all civil jury cases, jurisdiction for which is based on 28 U.S.C. § 1332, 45 U.S.C. § 51, and 46 U.S.C. § 688, the jury shall consist of six members." (Effective February 22, 1971)

6. *New Mexico* (February 19, 1971)
   "In all civil jury cases the jury shall consist of six (6) members." (Effective May 1, 1971)

7. *Wyoming* (February 25, 1971)
   "In all civil jury cases, jurisdiction for which is based upon 28 U.S.C. 1332, 45 U.S.C. 51, and 46 U.S.C. § 688, the jury shall consist of six members." (Effective May 1, 1971)

8. *Indiana, Southern* (February 26, 1971)
   "In all civil jury cases, jurisdiction for which is based on 28 U.S.C. § 1332 (diversity of citizenship and amount in controversy), 45 U.S.C. § 51 (Federal Employers' Liability Act), 46 U.S.C. § 688 (Jones Act), and cases involving condemnation of real and personal property under the power of eminent domain under the laws of the United States, the jury shall consist of six (6) jurors." (Effective May 1, 1971)

9. *California, Central* (March 8, 1971)
   "In all cases in which a jury is demanded in civil cases, trial of the cause shall be before a jury consisting of six (6) members." (Effective March 15, 1971)

10. *Indiana, Northern* (March 10, 1971)
    "In all civil jury cases, jurisdiction for which is based on 28 U.S.C. § 1332 (diversity of citizenship and amount in controversy), 45 U.S.C. § 51 (Federal Employers' Liability Act), 46 U.S.C. § 688 (Jones Act), and cases involving condemnation of real and personal property under the power of eminent domain under the laws of the United States, the jury shall consist of six (6) jurors." (Effective May 1, 1971)

11. *Kansas* (March 11, 1971)
    "In all civil jury cases, except as may be otherwise expressly required by law or controlling rule, the jury shall consist of six members." (Effective June 1, 1971)

12. *California, Southern* (March 19, 1971)
    "In all cases in which a jury is demanded in civil cases, trial of the cause shall be before a jury consisting of six (6) jurors." (Effective April 15, 1971)

13. *Hawaii* (March 31, 1971)
    "In all civil jury cases for which jurisdiction is based on 28 United States Code, Section 1332, 45 United States Code, Section 51, and 46 United States Code, Section 688, the jury shall consist of six members." (Effective April 12, 1971)

14. *Louisiana, Western* (April 9, 1971)
    "In all civil jury cases, jurisdiction for which is based on 28 U.S.C. § 1332, 45

U.S.C. § 51, and 46 U.S.C. § 688, the jury shall consist of six members, with three peremptory challenges allowed to each opposing party. One alternate juror, in lengthy cases, will be empanelled, with one peremptory challenge allowed to each of the opposing parties." (Effective April 15, 1971)

15. *Pennsylvania, Eastern* (April 13, 1971)

"(a) Except as provided in (b), juries in civil cases shall consist, initially, of eight (8) members. Trials in such cases shall continue so long as at least six (6) jurors remain in service. If the number of jurors falls below six (6), a mistrial shall be declared upon prompt application therefor by any party then on the record.

(b) Trial by a jury consisting of twelve (12) members may be had if written demand therefor (with notice to all parties) is filed with the court not less than thirty (30) and not more than sixty (60) days following service of the last pleading directed to the issue triable of right by the jury.

(c) This rule shall become effective on May 1, 1971. All civil jury cases pending in this court on the effective date hereof shall be tried in accordance with sub-division (a) unless demand for trial by jury consisting of twelve (12) members is made within fifteen (15) days following the effective date of this rule." (Effective May 1, 1971)

16. *District of Columbia* (April 16, 1971)

"In all civil cases tried in this Court the jury shall consist of six (6) members, except in cases of eminent domain." (Effective June 1, 1971)

17. *Louisiana, Eastern* (April 20, 1971)

"In all civil jury cases, the jury shall consist of six (6) members." (Effective May 1, 1971)

18. *Colorado* (April 21, 1971)

"In all civil jury cases, except as may be otherwise expressly required by law or controlling rule, the jury shall consist of six members." (Effective June 1, 1971)

19. *Texas, Western* (May 1, 1971)

"In all civil jury cases, except as may be otherwise expressly required by law or controlling rule, the jury shall consist of six members." (Effective July 1, 1971) (as amended July 1, 1971)

20. *Illinois, Northern* (May 18, 1971)

"In all jury cases, except as may be otherwise expressly required by law or controlling rule, the jury shall consist of six members." (Effective September 13, 1971)

21. *New York, Eastern* (May 19, 1971)

"In order to obtain a jury of twelve, the party demanding a jury trial pursuant to F.R.C.P. 38 must specify a jury of twelve in his demand. If a jury is timely demanded without specifying a jury of twelve, any other party entitled to a jury trial of right may secure a trial by a jury of twelve by serving upon the other parties and a demand specifying a jury of twelve not later than the later of (a) the time provided in F.R.C.P. 38(b), or (b), ten days after the service of a timely demand for a jury which has not specified a jury of twelve." (Effective September 1, 1971)

22. *Florida, Middle* (May 27, 1971)

"All civil jury cases, jurisdiction for which is based upon 28 U.S.C. § 1332, 45 U.S.C. § 51, and 46 U.S.C. § 688, shall be tried to a jury which shall consist of six members." (Effective July 1, 1971)

23. *Pennsylvania, Western* (May 27, 1971)

"In all civil jury cases the jury shall consist of six members. This Rule shall be applicable to all civil actions tried in this District on or after September 1, 1971." (Effective September 1, 1971)

24. *New Jersey* (May 28, 1971)

"In all civil jury actions, except as may be otherwise expressly required by law, the jury shall consist of six members." (Effective September 1, 1971)

25. *Oregon* (June 7, 1971)

"(a) In all civil cases tried in this court to a jury the number of jurors shall be six unless otherwise ordered by the court.

(b) This provision shall not alter the number of challenges available to a party under 28 U.S.C. Sec. 1870 or Rule 49(b) Fed.Rules Civ.Proc." (Effective July 1, 1971)

26. *Maryland* (June 10, 1971)

"In civil cases in which trial by jury has been demanded pursuant to F.R. C.P. 38, the jury shall consist of six jurors, plus such number of alternate jurors, as the court may deem necessary, unless a party to the action, not less than thirty (30) days before the date of trial requests in writing, a jury of twelve." (Effective August 10, 1971)

27. *Alabama, Middle* (July 12, 1971)

"In all civil jury cases the jury shall consist of six (6) members." (Effective August 15, 1971)

28. *Wisconsin, Eastern* (July 26, 1971)

"In all jury cases except as may be otherwise expressly required by law or controlling rule, the jury shall consist of six members." (Effective September 1, 1971)

29. *New Hampshire* (July 27, 1971)

"(a) *Number of Jurors and Initial Selection*

(1) In all civil jury cases, the jury shall consist of six members and the clerk shall select by lot the names of six persons to be drawn initially.

(2) In all criminal jury cases, the jury shall consist of twelve members and the clerk shall select by lot the names of twelve persons to be drawn initially." (Effective September 1, 1971)

30. *Montana* (Filed July 14, 1971)

"(d) *Jury Trials*

(1) A jury for the trial of civil cases shall consist of six persons plus such alternate jurors as may be impaneled.

31. *Rhode Island* (Filed September 20, 1971)

"(a) *Six-man juries*. In all civil jury cases, the jury shall consist of six members. The jury in a criminal case shall consist of twelve members, except as provided in Rule 23(b) of the Federal Rules of Criminal Procedure. (Effective September 27, 1971)

*See* Zeisel, . . . And Then There were None: The Diminution of the Federal Jury, 38 U.Chi.L.Rev. 710 (1971).

E. GORDON WEST, District Judge (dissenting):

These consolidated cases result from a unique provision of Louisiana law which gives appellate courts the right, in civil cases, of unlimited review of both question of fact and law.

Art. VII, § 10 of the Constitution of Louisiana provides, inter alia:

"The Supreme Court has · control of, and general supervisory jurisdiction over all inferior courts. * * * In civil case, its appellate jurisdiction extends to both the law and the facts. In criminal matters, its appellate jurisdiction extends to questions of law only."

And Art. VII, § 29 of the Constitution of Louisiana provides that:

"All appeals of which the courts of appeal have appellate jurisdiction as provided in this Section shall be on both the law and the facts, except where the appeal is limited to questions of law only by any other Section of this Constitution."

The plaintiffs in these cases, and in several other cases in which proceedings have been stayed pending the outcome of these cases, contend that this unrestricted right of the Appellate Courts in Louisiana to completely disregard and

set aside the findings of fact of a jury violates the provisions of the Seventh Amendment to the United States Constitution, which, they contend, is operative on the States through the due process clause of the Fourteenth Amendment. The Seventh Amendment provides:

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

The Fourteenth Amendment, Section 1, says:

" * * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *"

Despite the historical background contained in the majority opinion, and the obvious expressions of personal preferences for non-jury rather than jury trials in civil cases, the fact remains that the only real question involved here is whether or not, despite the personal preferences of some judges, the mandates of the Seventh Amendment should, in fact, be operative on the States through the due process clause of the Fourteenth Amendment. The issue here is further narrowed because of the fact that the majority of this Court agree, as indeed they must, that if the right to trial by jury in civil cases is a so-called "fundamental right," then, whatever be the mandates of the Seventh Amendment, they are indeed operative on the States through the Fourteenth Amendment. It is difficult to determine exactly what definition the majority would place upon the word "fundamental." They refer to it as meaning "basic in our system of jurisprudence"; "implicit in the concept of [Anglo-American] ordered liberty"; and "fundamental to the American scheme of justice." The majority state that over the years the Supreme Court has held "most of the guarantees of the Bill of Rights" [the first eight Amendments] to be requirements of due process, and thus operative on the States

through the Fourteenth Amendment. They observe that in doing so, in each case, the Supreme Court has characterized the particular guarantee in question as "fundamental" in accordance with one or more of those definitions. They then conclude that since the Supreme Court has never adopted the "total incorporation" principle [automatically incorporating all eight Amendments within the purview of the Fourteenth Amendment] and since the Supreme Court has not specifically included the Seventh Amendment with those that it has thus far held to be incorporated in the Fourteenth Amendment, a civil jury trial is "not so implicit in the concept of ordered liberty in a cooperative federalism as to be required of the States by due process." The majority further concludes, as if recognizing that their characterization of Seventh Amendment rights as "nonfundamental" rests on shaky ground, that "assuming the right to a civil jury trial is required by due process, the Louisiana scheme does not destroy that right, but modifies it in accordance with fair procedures, many of which are analogous to procedures established in the Federal Rules of Civil Procedure." There are fallacies in these conclusions. First, I believe that the rights secured by the Seventh Amendment are indeed fundamental when viewed in light of any of the definitions of "fundamental" used or alluded to by the majority. The fact that the Supreme Court has not, as yet, included the Seventh Amendment, either by total incorporation or otherwise, among those which it has held to be operative on the States through the Fourteenth Amendment, is no reason, in and of itself, for this Court to conclude that the Seventh Amendment does not involve a fundamental right. The ultimate question involved here has never been passed upon by the Supreme Court, i. e., when a State does, in fact, by its laws, accord to its citizens the right to trial by jury in civil cases, are the State Courts then bound by the mandate of the Seventh Amendment prohibiting an appellate court from reexamining the facts found by the jury otherwise than according to

the rules of common law? What the Supreme Court has to date not done, cannot answer this question. And secondly, a fallacy in the Court's conclusion is that the provision of Louisiana law complained of by these plaintiffs is a provision of law directly *contrary* to the Federal Rules of Civil Procedure and not "analogous to the procedures" established by those rules. For example, Rule 38 of the Federal Rules of Civil Procedure expressly provide:

> "The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate."

It is only this same right, together with the right secured by the Seventh Amendment, that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law" that the plaintiffs here seek to have "preserved inviolate" by the courts of the State of Louisiana.

The answers to the questions presented in these cases do not depend upon nor should they be influenced by the personal preferences of those called upon to supply those answers. By the same token, the fact that there might have been a decline in the use of juries in civil trials in England is really of no moment. What England does is her business alone. As the majority so aptly states, in quoting the "unforgettable words" of Mr. Justice John Marshall, "We must never forget that it is a constitution we are expounding." The fact, if it be one, stated in the majority opinion, that England's "Great Charter" did not guarantee trial by jury is also of no moment. Our Constitution does. It is our Constitution we are expounding and not that of the Magna Carta of England.

It is my belief that the right to trial by jury in civil cases should be declared to be just as fundamental a right in the State Courts as the United States Constitution has declared it to be in the Federal Courts, and that civil jury trials, in the State Courts, should be subject to the mandates and proscriptions of the Seventh Amendment. It is a matter of historical fact that the Constitution of the United States was originally ratified and adopted only with the understanding that certain amendments would be made which would protect what was believed by the States to be certain fundamental and inalienable rights. The result of this understanding was the first ten Amendments usually referred to as the Bill of Rights. Found prominently included among these Amendments is Amendment Number Seven, which guarantees the right to jury trial in civil cases, and specifically precludes appellate courts from examining, other than according to the rules of common law, facts found by the jury. The majority make the assertion that the right to trial by jury in civil cases was "intentionally left out of the final document" (the United States Constitution). But they fail to add that the promise of its inclusion by amendment was a prerequisite to adoption of the Constitution itself. The constitutional importance of the principles contained in the Seventh Amendment was recognized by the United States Supreme Court in Chicago, B. & Q. R. Co. v. City of Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897), when it said:

> "One of the objections made to the acceptance of the constitution as it came from the hands of the convention of 1787 was that it did not, in express words, preserve the right of trial by jury, and that, under it, facts tried by a jury could be re-examined by the courts of the United States otherwise than according to the rules of the common law. The seventh amendment was intended to meet those objections, and to deprive the courts of the United States of any such authority." 17 S.Ct. 581, 587.

To conclude, by whatever reasoning adopted, that the right to trial by jury in civil cases, with the findings of fact of the jury being considered final except as otherwise provided by common law concepts, is not and has not always been considered a fundamental right by the

American people, is simply to defy history. The Declaration of Resolves of the First Continental Congress, signed on October 14, 1774, had, as one of its provisions:

> "5. That the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." See Stuart Gerry Brown, "We Hold These Truths," 1941, p. 20.

This was listed in the "Declarations and Resolves" as one of the rights of the inhabitants of the English Colonies in North America "by the immutable laws of nature, the principles of the English Constitution, and the several charters or compacts * * *."

The Virginia Bill of Rights, adopted by the Virginia Convention on June 12, 1776, provided:

> "11. That in controversies respecting property, and in suits between man and man, the ancient trial by jury is preferable to any other and ought to be held sacred." See "We Hold These Truths," supra, p. 35.

The Declaration of Independence, written by Thomas Jefferson between June 10 and July 4, 1776, in reciting grievances against King George, includes:

> "For depriving us in many cases of the benefits of Trial by Jury." See "We Hold These Truths," supra, p. 39.

The Massachusetts Bill of Rights, largely the work of John Adams, added to the Massachusetts Constitution in 1780, provides:

> "XV. In all controversies concerning property, and in all suits between two or more persons * * * the parties have a right to a trial by jury; and this method of procedure shall be held sacred." See "We Hold These Truths," supra, p. 53.

The Declaration of the Causes and Necessity of Taking Up Arms, prepared by John Dickinson and Thomas Jefferson in July, 1775, listed as one of the causes:

> " * * * for depriving us of the accustomed and inestimable privilege of trial by jury in cases affecting both life and property;" See Documents of American History, 8th Edition, by Henry Steele Commager, p. 93.

On July 14, 1787, the Northwest Ordinance was adopted. This was an ordinance for the government of the territory of the United States northwest of the River Ohio. Article 2 of that ordinance provided, in part, that:

> "The inhabitants of the said territory shall always be entitled to the benefit of the writ of habeas corpus, and of the trial by jury. * * * No man shall be deprived of his liberty or property, but by the judgment of his peers or the law of the land." See Documents of American History, supra, p. 130–131.

Despite the majority's opinion that "A distinction can, of course, be drawn between the right to a jury trial in criminal cases and the right in civil cases," we see the right to trial by jury in criminal cases and civil cases being considered as a unitary right, and we see the right to trial by jury being apparently considered as a right equal to that of the great writ of habeas corpus. It can hardly be disputed that the right to trial by jury in both criminal and civil cases was considered to be a very fundamental right at the time of and following the formation of the Union. In view of these expressions of the fundamental nature of trial by jury, it is indeed difficult for me to understand the conclusion reached by the majority of this Court that "Thus, the presence of a jury in common law suits is based on an accident of history."

In 1830, Mr. Justice Story, speaking for the United States Supreme Court in the case of Parsons v. Bedford et al., 3 Pet. 433, 7 L.Ed. 732, recognized in clear terms the fundamental nature of the

right to trial by jury in civil cases. He said:

"The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy. The right to such a trial is, it is believed, incorporated into and secured in every State constitution in the Union; and it is found in the constitution of Louisiana. One of the strongest objections originally taken against the Constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases. As soon as the Constitution was adopted, this right was secured by the seventh amendment of the Constitution proposed by Congress; and which received an assent of the people so general as to establish its importance as a *fundamental guarantee of the rights and liberties of the people.*" (Emphasis added.) 3 Pet. 433, 443.

And then, to dispel the idea, which has been alluded to in the majority opinion, that "common law" as used in the Seventh Amendment means "the basic law of England," Mr. Justice Story said:

"The phrase 'common law,' found in this clause, is used in contradistinction to equity, and admiralty, and maritime jurisdiction. The Constitution has declared in the third article, 'that the judicial power shall extend to all cases in law and equity arising under this Constitution, and the laws of the United States, and treaties made or which shall be made under their authority,' etc., and to all cases of admiralty and maritime jurisdiction. It is well known that in civil causes, in courts of equity and admiralty, juries do not intervene, and that courts of equity use the trial by jury only in extraordinary cases to inform the conscience of the court. When, therefore, we find that the amendment requires that the right of trial by jury shall be preserved in * * * suits at com-

mon law, the natural conclusion is that this distinction was present to the minds of the framers of the amendment. By common law they meant that the Constitution denominated in the third article 'law;' not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and maritime law and equity was often found in the same suit. Probably there were few, if any, States in the Union, in which some new legal remedies differing from the old common law forms were not in use; but in which, however, the trial by jury intervened, and the general regulations in other respects were according to the course of the common law. Proceedings in cases of partition, and of foreign and domestic attachment, might be cited as examples variously adopted and modified. In a just sense, the amendment, then, may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights." 3 Pet. 433, 446.

Thus, the argument of the majority here that Louisiana could not be bound by the Seventh Amendment because her law is basically the civil law of France rather than the common law of England is specious.

The majority concludes that because the trial courts have such rights, in certain circumstances, as to grant new trials, or to grant summary judgments, or judgments notwithstanding the verdict, that this somehow eliminates or dilutes the mandate of the Seventh Amendment that the findings of fact of a jury shall not be reviewed by appellate courts except according to the common law. This argument was also answered in *Parsons*.

The Court, in commenting on the common law methods of reviewing facts, said:

"The only modes known to the common law to re-examine such facts are the granting of a new trial by the court where the issue was tried, or to which the record was properly returnable; or the award of a venire facias de novo by an appellate court for some error of law which intervened in the proceedings. The Judiciary Act of 1789, ch. 20, sec. 17, has given to all the courts of the United States 'power to grant new trials in cases where there has been a trial by jury, for reasons for which new trials have usually been granted in the courts of law.' And the appellate jurisdiction has also been amply given by the same act, (sec. 22, 24) to this court to redress errors of law; and for such errors to award a new trial, in suits at law which have been tried by a jury.

"Was it the intention of Congress, by the general language of the Act of 1824, to alter the appellate jurisdiction of this court, and to confer on it the power of granting a new trial by a re-examination of the facts tried by the jury—to enable it, after trial by jury, to do that in respect to the courts of the United States, sitting in Louisiana, which is denied to such courts sitting in all other states of the Union? We think not."

Consequently, the fact that there are means, at common law, for reviewing findings of fact, in no way diminishes the fundamental nature of the right to trial by jury in civil cases. The fact that there does exist such means of reviewing facts under certain circumstances simply gives meaning to the language of the Seventh Amendment when it says that no fact tried by a jury shall be otherwise re-examined in any court of the United States *than according to the rules of the common law*. These "rules of common law" do not include a rule, such such as Louisiana has, which permits an appellate court to substitute its own finding of fact for those of the jury, even where no manifest error is found to exist in the jury findings, and to reverse the verdict of the jury even though no error of law is found.

To conclude, as the majority of this Court does, that appellate review of facts under Louisiana law is based on the same "manifest error" doctrine followed by the Federal Courts is simply to mis-state the facts. Had the reversals by the Louisiana Appellate Courts in the many cases here being considered by this Court been based upon the "manifest error" doctrine, there is little doubt that these cases would never have been brought before us. It is not enough to quote, as the majority does, Judge Albert Tate (now a Justice of the Louisiana Supreme Court) to the effect that "[Louisiana] appellate courts must adhere to the settled jurisprudential rule * * * that a trial court's factual determinations should be accepted on appellate review in the absence of manifest error." This may be, and probably is his opinion as to what the Louisiana appellate courts should be required to do. But the cold, hard fact is that this is *not* what the Louisiana appellate courts do, nor is it what they are required by Louisiana law to do. In the case of Melancon v. McKeithen, one of the cases here under consideration, the Court reversed a jury verdict for the plaintiff with the terse explanation that the jury verdict was "contrary to the law and the evidence." In Hill v. McKeithen, another one of the cases before us, the appellate court reversed the jury's finding for the plaintiff on the ground that "We find the plaintiff failed to sustain the burden of proving that her injuries were caused by the negligent operation of the vehicle in which she was riding." But the jury had found otherwise, and there is no suggestion that the Court applied the manifest error test. The fact is that the Appellate Court simply disagreed with the jury findings and, as they are permitted to do under Louisiana law, they simply substituted their interpretation of the facts for that of the jury. And so it goes in each of the several cases be-

fore us. There is no finding of manifest error, and the jury's findings of fact are not re-examined by the Appellate Courts of Louisiana only according to the rules of the common law. The simple fact is that if the Judges of the Appellate Court in Louisiana disagree with the conclusions reached by the jury, they may, and often do, simply set the jury verdict aside without regard to whether or not manifest error was committed by the jury. In Louisiana the facts are passed upon a de novo basis by the Appellate Courts, based entirely upon a cold record, and without ever having had an opportunity to see and hear any witnesses. Under Louisiana law, the findings of fact of the jury are quite meaningless because, whether manifest error is found or not, the Appellate Courts are not bound by the jury's findings. This, I believe, violates a fundamental right in contravention of the Seventh and Fourteenth Amendments to the United States Constitution.

As early as 1816, in the case of Abat v. Doliolle, 4 Mart. (O.S.) 316 (La.1816), the Supreme Court of Louisiana announced in no uncertain terms that appellate courts in Louisiana could review the evidence taken at the trial and freely reverse any jury verdict as they saw fit. This power of the Louisiana Appellate Courts was reiterated by the Louisiana Supreme Court in Wiggins v. Guier, 13 La.Ann. 356, 357 (1858), in the following language:

"As this case may go to the Supreme Court of the United States, we take occasion to correct an erroneous impression in regard to the powers of this Court over the facts of the case. Where evidence is certified by the Clerk, or a statement of facts is made by the District Judge, this Court does not examine the same as a Court of Error, but passes upon the truth of supposed facts, disregards the testimony of witnesses unworthy of belief, reviews and weighs the evidence, gives effect to that which preponderates, and, in fine, pronounces upon the testimony in the case precisely as the jury or the District Judge ought to have done. Jones v. Pereira, 13 La. Ann. 102."

Regardless of the fact that some Appellate Judges in Louisiana may adhere to the common law "manifestly erroneous rule," the plain truth is that the Louisiana Constitution grants power to Appellate Courts to freely review findings of fact of the jury and to reverse those findings to fit their own conception of what *they* believe the facts to be. And a review of the manner in which the jury's findings were reversed in the several cases involved here leaves no doubt that many of the Appellate Judges of Louisiana feel exactly as the late Judge Caldwell Herget, of the Louisiana First Circuit Court of Appeals, felt when he said:

"I cannot, under any circumstances, rationalize, as suggested by Judge Tate, in the face of the clear and unambiguous verbiage of the Constitution the courts' right to change or in any way affect the jurisdiction or the right of appeal so granted to the litigant by the Constitution; nor can I under any circumstances persuade myself the appellate court should not reverse a factual decision of the trial court in the absence of manifest error; nor am I imbued with any impropriety in those instances wherein the appellate court might have decided a case differently by construing the evidence contrary to that of the trial court for in doing so it is doing nothing other than complying with the Constitution of the State. Explicitly the Constitution grants a litigant an appeal on both the law and the facts. Constitutionally, there is no basis for the view the appellate judge is required to accept the finding of fact of the trial court, though it differs from his own. Likewise, I am not in accord with the statement (from Judge Tate's Article supra. Page 612): 'For, if no weight at all is given to the trial court's finding, then we might as well dispense with the trial below as an empty and time-wasting ceremonial.

\* \* \* ', for the reason that appeals are not taken from by far the greater number of decisions of the trial courts; however, conceding, if granted the constitutional right so explicitly set forth in our Constitution, more appeals would be filed if the litigant were apprised of the knowledge the appeal would be reviewed on both the law and the facts, the courts have no authority to curtail such appeals, even under such compelling reasons. In short, we have no basis for substituting our views—however persuasive, well founded and sound—for the directives appearing in the Constitution by which we are bound. Though in an effort to assuage our consciences we may resort to subtle and tenuous recitations to bolster our views, how can anyone read the clear, unequivocal and explicit constitutional provisions herein involved and attribute with any degree of reason any other meaning than that the litigant in Louisiana is, on appeal, guaranteed a review by the appellate court on both the law and facts? There is absolutely no rational basis on which the court may deny the litigant a review on the facts and grant a review on the law. Such result could only be obtained upon the court's arbitrary decision to deny specifically granted constitutional rights to the litigant. I believe this to be wrong inasmuch as it denies, without valid reason, the vested constitutional rights of the litigant and, until directed otherwise by the Supreme Court of this State, I shall continue to review the record on appeal on the law and the facts and not on the question of the determination of the erroneousness of the decision of the trial court, and express my opinion on the issues presented on my own resolution of the same." Fortenberry v. Scogin, 149 So.2d 732, 737, 738, (La.App. 1st Cir. 1963).

I believe that nothing more need be said to show the incorrectness of the majority's conclusion that "assuming the right to a civil jury trial is required by due process, the Louisiana scheme does not destroy that right, but modifies it in accordance with fair procedures, many of which are analogous to procedures established in the Federal Rules of Civil Procedure." Neither the United States Constitution nor the Federal Rules of Civil Procedure would have permitted a Federal Appellate Court to reverse the jury findings in the cases here involved for the reasons given by the Louisiana Appellate Courts in these cases.

The majority say that "It is presumptuous and chauvinistic to argue that Civil trials in such countries as France and Germany and the Scandinavian countries are unfair." But no one is here arguing that at all. These plaintiffs in these cases are not even arguing that civil trials in Russia or Cuba are unfair. They are not arguing that simply because it is immaterial. We must not forget that "It is a constitution we are expounding." The plaintiffs here simply argue that *our Constitution*, not the laws of France, Germany, Russia, or Cuba, prohibits the appellate courts from examining the facts found by a jury except according to the rules of common law.

The precise question presented here is not even whether or not a State must accord a person a right to trial by jury in a civil case. It is, instead, whether or not, once that right has been accorded by State law, the proscriptions of the Seventh Amendment should apply. I believe they should. The majority concluded that they should not because, in their opinion, the right to trial by jury in a civil case is not a "fundamental right." It is difficult for me to understand the majority's classification of the right to trial by jury in civil cases as "non-fundamental" when the author of the majority opinion was so adamant in his dissent in Karr et al. v. Schmidt et al. (CA 5 1972) 460 F.2d 609 that the right of a school boy to wear his hair the length he wanted it was such a "fundamental right" as to be protected by both the due process clause and the equal protection clause of the United States Con-

stitution, and it was so "fundamental" a right that it could not be regulated in any way by the school board. It is further interesting to note that Judge Wisdom, in his dissent in *Karr*, said:

> "My differences with the Court's understanding of 'fundamental' rights are differences of legal attitude and philosophy. Judge Learned Hand once described 'fundamental' as a word 'whose office usually, though quite innocently, is to disguise what [judges] are doing and impute to it a derivation far more impressive than their personal preferences, which are all that in fact lie behind the decision.' L. Hand, The Bill of Rights, 70 (1958). I am sure Judge Hand would agree that his comments are equally applicable to judges' *refusal* to attach the 'fundamental' label."

I suggest that the refusal of the majority in this case to "attach the fundamental label" to the right to a meaningful trial by jury in civil cases is done, though perhaps quite innocently, to disguise what they are doing and to impute to their decision a reason far more impressive than their personal preferences, which I suspect is all that in fact really lies behind the majority decision.

If the right to trial by jury in civil cases, with its Seventh Amendment protection, is not a fundamental right, then I suggest that the Congress of the United States, the legal profession, the courts, and the taxpayers, are being scandalously deluded. In 1968 the Congress passed the Jury Selection and Service Act of 1968. P.L. 90–274, 82 Stat. 53, 28 U.S.C.A. § 1861 et seq. It became effective on December 22, 1968. Prior to the passage of that Act, there was much criticism of the manner in which juries were selected. It was observed that the obvious infirmity in the old system of selecting jurors was that "It violated the basic principle that no man shall be proceeded against or prosecuted 'except by the lawful judgment of his peers,' a phrase deriving from Magna Carta (Chap. 39 as translated in A. Howard, Magna Carta: Text and Commentary 43

(1964), and transposed into our constitutional system as a *fundamental right* in every individual." (Emphasis added.) See The Improvement of the Administration of Justice, Am. Bar Ass'n., Fifth Edition 1971, p. 63. It was also the conclusion of the section on judicial administration of the American Bar Association that:

> "Exclusion of a person from consideration for jury service disenfranchises him just as surely as excluding him from the polls. As DeTaqueville observed in 'Democracy in America' in a chapter entitled 'Trial by Jury in the United States Considered as a Political Institution':
>
> > " 'The system of the jury, as it is understood in America, appears to me to be as direct and as extreme a consequence of the sovereignty of the people as universal suffrage. These institutions are two instruments of equal power, which contribute to the supremacy of the majority.' " [Vol. 1, "Democracy in America", The World's Great Classics, Colonial Press.] See The Improvement of the Administration of Justice, supra, p. 63.

Judge Irving R. Kaufman, of the United States First Circuit Court of Appeals and presently Chairman of the Judicial Conference Committee on the Operation of the Jury System, alluded to the fundamental nature of the jury system thusly:

> "[T]here can be no universal respect for law unless all Americans feel that it is *their* law—that they have a stake in making it work. When large classes of people are denied a role in the legal process—even if that denial is wholly unintentional or inadvertent—there is bound to be a sense of alienation from the legal order." Kaufman, A Fair Jury—The Essence of Justice, Mar.– Apr. 1968 Trial Lawyers Forum 9, 20. See also The Improvement of the Administration of Justice, supra, p. 64.

Recognizing the importance of trial by jury to the American system of justice,

Congress, in passing the Jury Selection Act of 1968, made sweeping changes in the method of selecting jurors, and made it clear that it intended first to give litigants a right to jury trial, and secondly, to give all citizens an opportunity to serve on juries, and thirdly, to create an obligation on all citizens to serve on juries when summoned. Every United States District Court in the country was compelled by this Act to prepare elaborate jury selection plans, and then the plans had to be submitted to and approved by their respective Circuit Councils. The Judicial Conference Committee on the Operation of the Jury System is a continuing committee that devotes a tremendous number of judge hours to the study and improvement of the jury system. The amount of time and money devoted by judges to the operation and improvement of the jury system is incalculable as there is no record keeping designed to log this time. In 1962, the cost of juror fees for the Federal Courts alone was $4,800,000. In 1972, the appropriation for payment of juror fees in the Federal Courts was $15,930,000, and it is estimated that for 1973, that figure will increase to $18,830,000. I cite these figures simply to illustrate the fact that instead of the jury system declining in importance, as has been suggested by the majority of this Court, it has taken on a much larger role since 1968 in the administration of justice in the Federal Courts, and has apparently been considered fundamental enough for Congress to more than quadruple, since 1962, the amount of money it appropriates for juror fees alone. In short, I cannot subscribe to the view that the right to a meaningful trial by jury in civil cases is not a fundamental right. No one could seriously question the fact that the right to trial by jury in Federal Courts is protected by the Seventh Amendment, and no one could seriously question the fact that in the federal system, the facts found by the jury may not be re-examined by an appellate court except according to the rules of common law. I believe that the right to trial by jury as

provided for in the Seventh Amendment to the United States Constitution is as fundamental a right as those contained in the remainder of the first eight Amendments, and that thus, the guarantees of the Seventh Amendment should be held to be operative on the States through the Fourteenth Amendment. I believe that the Seventh Amendment prohibits the States from granting a right to trial by jury in civil cases on the one hand, and then, on the other hand, as is done in Louisiana, nullifying the total effect of the jury trial by allowing the Appellate Judges to set aside the findings of the juries simply because they personally do not agree with those findings. The majority opinion states that the question of the applicability of the Seventh Amendment provisions to the States through the due process clause of the Fourteenth Amendment was squarely raised in Walker v. Sauvinet, 92 U.S. 90, 23 L.Ed. 678, and that it was decided contrary to the position taken by the plaintiffs in these cases. It further states that "For a hundred years the Supreme Court had not deviated from Walker v. Sauvinet." But the issue with which we are here concerned was *not* presented to the Court in *Walker*. In *Walker*, the question was whether or not a judge could, by statute, be permitted to direct a verdict *when the jury failed to agree*. In the cases before us now, the question is whether or not Appellate Courts can re-examine the *facts found and agreed upon by a jury* other than according to the rules of common law.

I would hold that, as long as the laws of Louisiana accord to its people the right to trial by jury in civil cases, the Appellate Courts are prohibited by the Seventh Amendment to the United States Constitution from re-examining the facts found by the jury otherwise than according to the rules of the common law, and that any and all laws of the State of Louisiana in conflict with that holding should be declared unconstitutional, null and void.

For these reasons, I respectfully dissent.